WhitakeR, Judge,
delivered the opinion of the court:
These cases, Nos. L-51 and L-208, have been consolidated in accordance with the opinion and mandate of the Supreme Court in Seminole Nation v. United States, 816 U. S. 286, 651.
We shall first discuss case L-51. In that case the original petition was filed on February 24, 1930. An amended petition was filed on September 19,1934, setting forth additional claims. On December 2, 1935, we rendered a decision holding the plaintiff was entitled to recover $1,317,087.27 (82 C. Cls. 135). The Supreme Court granted certiorari and reversed the decision of this court, on the ground, among others, that judgment had been rendered on claims first asserted in the amended petition which had been filed after the expiration of the statute of limitations fixed in the Act giving this court jurisdiction.
Thereafter, Congress passed the Act of August 16, 1937 (50 Stat. 650), authorizing the filing of an amended petition to set up the claims denied. A second amended petition setting up these claims was then filed, in which plaintiff made claim against the defendant on five items, set out in sections III to YII of its petition. We allowed recovery of $1,790.00 on item 1 (section III of the petition), $13,501.10 on item 2 (section IY), $3,097.20 on item 3 (section V), and we disallowed all of item 4 (section YI) and item 5 (section YII) (93 C. Cls. 500). The Supreme Court affirmed us as to items 1, 3, and 4, but remanded the case for further findings on items 2 and 5 (316 U. S. 286).
These items only are now before us. There is also before us the offsets to which the defendant is entitled for gratuitous expenditures made for plaintiff’s benefit.
Item 2 is a claim based upon the defendant’s obligation under article YIII of the Treaty of 1856 to pay to the tribe per capita $25,000 per year. We found that there had not been paid to the tribe per capita $92,423.74 of the amount so due, but that during the years 1870 to 1874, $66,422.64 of this amount had been paid to the tribal treasurer and to certain designated creditors of the tribe at the request of the General Council of the tribe, and that in 1907, $12,500.00 had been paid to the Indian Agent under authority of an act of Congress. Credit against the $92,423.74 was given for *598 these payments. Our decision on this item was affirmed, except as to the payments made to the tribal treasurer in the years 1870 to 1874.
The Supreme Court remanded the case with instructions to find whether or not at the time these payments were made to the tribal treasurer and to creditors of the tribe the General Council of the tribe was corrupt, venal, and false to its trust to the Seminole people, and whether at the time the payments were made the disbursing officers of the United States knew of such corruption, venality, and falsity, and if both questions were answered in the affirmative, whether the Nation got the benefit of the payments made.
Before discussing the case on the merits we must first consider the defendant’s defense that we have no jurisdiction to render judgment for the payments made to the tribal treasurer in the years 1870 to 1874, because the plaintiff did not base its right to recover them upon the ground advanced by the Supreme Court, to wit, that, when the payments in part satisfaction of them were made to the tribal treasurer and to certain creditors of the tribe on order of the General Council of the tribe, the General Council was corrupt, venal, and false to its trust and that the officials of the United States making the payments knew that it was.
Whether or not plaintiff’s petition is broad enough to permit assertion of such a ground, it was never in fact asserted in this court, either in briefs or argument or in any form whatever. On the contrary, the allegations of the petition, the requests for findings of fact, and the statements in the briefs show that plaintiff’s claim was not based upon this ground. The defendant never understood that it was, and this court never understood that it was, and neither the defendant nor the court had any reason to think that it was.
Section IY of plaintiff’s petition (item 2) merely alleges that defendant “either illegally disbursed or failed or neglected to disburse” the amounts appropriated by Congress to fulfill the treaty obligation. Why any of the disbursements were illegal was not stated. It is plain, though, that it was not based on the fact that the General Council was corrupt at the time these payments were made to the tribal treasurer and to certain creditors on order of the General *599 Council, because in section VII of its petition, relating to payments made in alleged violation of section 19 of the Curtis Act (item 5), it is alleged that “since the passage of said Aet of April 15,1874, it was reported by the officers of defendant that the Seminole tribal officials were misappropriating the Seminole tribal funds entrusted to them and robbing the members of the tribe of an equal share of the tribal income.” [Italics ours.] . The payments in question were made from 1870 to 1874, prior to the passage of the Act of April 15, 1874.
Plaintiff’s request for findings of fact also shows that no claim was made on this ground. With respect to this item it reads in pertinent part:
The United States disbursed the sums thus appropriated for the years involved, either by making direct payment per capita to members of the tribe, or by cash payment to the treasurer of the Seminole Nation, except for the fiscal years following, in which the amounts stated were neither disbursed to members of the tribe nor paid to the Seminole national treasurer. [Italics ours.]
No claim was made for payments to the tribal treasurer.
No claim is made for such payments in its brief. On the contrary, on page 39, in discussing the payments made in alleged violation of section 19 of the Curtis Act (item 5), it says:
Before the passage of the Curtis Act, the Seminole Nation was entrusted with the disbursement of certain of its tribal income, the payments of which were authorized to be made to the tribal treasurer (Acts of April 15, 1874,18 Stat. 29; and March 2, 1889, 25 Stat. 980,1004). However, soon after the passage of said Act of April 15,1874, the Seminole tribal officials ceased to be representative• of the majority of the tribe, and began using tribal moneys to further their own private interests. [Italics ours.]
These statements are negations of a claim that the General Council was false to its trust during the years 1870 to 1874.
It is, of course, true that a disbursement to officials of the tribe who were corrupt, venal, and false to their trust would be an “illegal” disbursement; but the mere allegation that *600 the sums were “illegally disbursed,” without an allegation of any facts to support the charge of illegality, complies neither with section 159 of the Judicial Code nor with Rule 10 of this court. Section 159 requires a claimant to “fully set forth in his petition the claim” and rule 10 requires him to set forth in his petition “a plain statement of the facts. * * *” No facts are alleged to show why the disbursements were illegal. It would be impossible from this allegation for the defendant to gain any intimation as to the basis of plaintiff’s claim.
In Merritt v. United States, 267 U. S. 338, 341, the Supreme Court said:
The practice of the Court of Claims, while liberal, does not allow a general statement of claim in analogy to to the common counts. It requires a plain, concise statement of the facts relied upon. See Rule 15, Court of Claims. The petition may not be so general as to leave the defendant in doubt as to what must be met. Schierling v. United States, 23 C. Cls. 361; The Atlantic Works v. United States, 46 C. Cls. 57, 61; New Jersey Foundry & Machine Co. v. United States, 49 C. Cls. 235; United States v. Stratton, 88 Fed. 54, 59.
The Jurisdictional Act under which plaintiff sued gave it the right to file an amended petition before January 1, 1938. Since no such petition was filed before that time setting up this ground of recovery, there is grave doubt of our authority to consider it. However, we do not pass on the question, since, as hereafter appears, we are of opinion plaintiff is not entitled to recover on the merits.
The defendent interposes the same defense to recovery on item 5.
In section YII of its petition dealing with item 5 plaintiff seeks to recover $864,702.58 paid to the tribal treasurer during the years 1899 to 1907 in alleged violation of section 19 of the Curtis Act. We held that section 19 of the Curtis Act did not apply to these payments and that plaintiff was not entitled to recover. The Supreme Court agreed that this section of the Curtis Act had no application to these payments, but remanded the case to us with instructions to find whether or not during the years 1899 to 1907 the General Council of the Nation was corrupt, *601 venal, and false to its trust and whether the disbursing officers of the defendant knew at the time the payments were made that this was so, and if so, whether the nation got the benefit of the money.
It seems plain that plaintiff did not seek recovery on this ground. In its petition dealing with this item plaintiff alleges that by the acts of April 15,1874, supra, and of March 2,1889 (25 Stat. 980,1004), certain payments were authorized to be paid to the tribal treasury, but that after the passage of the Act of 1874, it was reported to defendant that the tribal officials were corrupt and were robbing the members of the tribe of the income to which they were entitled, and that, in order to correct such conditions, Congress enacted the Curtis Act, approved June 28,1898 (30 Stat. 495), section 19 of which was set out. It was then alleged that the sum of $864,702.58 was paid to the tribal treasurer in violation of this section of this Act. Section VII of its petition concludes:
Therefore, the defendant is liable to plaintiff in the amount of $864,702.58 thus illegally disbursed in violation of said section 19 of said Act of June 28,1898.
The prayer of the petition reads:
Wherefore, plaintiff prays that judgment be entered against defendant for the total amounts due plaintiff under said unfulfilled treaty obligations of defendant, and for the total amounts of Seminole tribal funds illegally disbursed by defendant in violation of said section 19 of the Curtis Act, together with interest on same at five per cent per annum; and that plaintiff may have such other and further relief as to the court may seem just and proper. [Italics ours.]
It is plain that recovery was sought because the payments were made in violation of section 19 of the Curtis Act, and not because at the time they were made the General Council was corrupt. There are allegations of corruption in the petition, but they are alleged to show the reason for the passage of the Curtis Act and for its applicability to the payments made; they are not made as a ground of recovery.
Plaintiff’s request for findings of fact on this item requests only a finding on the amount of the payments during the *602 years in question. No request for a finding of corruption in the General Council is made. A large part of its brief on this item is devoted to allegations of corruption in the tribe, but this is all for the purpose of showing that section 19 of the Curtis Act was intended to apply to the character of payments for which plaintiff sued. Plaintiff asserted no right to recover except for the violation of section 19. Since no claim for recovery was made because the payments were made to corrupt officials, we did not consider its right to recover on this ground.
However, although plaintiff based its right to recover on the violation of section 19, it nevertheless did allege that as. to the years 1899 to 1907 the tribal officials were corrupt and introduced proof to support this allegation, and under its. prayer for general relief we suppose on our own motion we might have remanded the case for further proof to give-defendant an opportunity to refute this charge, and if the facts warranted it, we might have rendered judgment on this ground. We think, at least, we had jurisdiction to do so, and that we now have jurisdiction to do so, a petition setting up these facts having been filed within the time fixed by the jurisdictional act.
The defendant also says we have no jurisdiction to adjudicate a claim based upon defendant’s breach of its fiduciary duty to plaintiff, because the jurisdictional act conferred jurisdiction on us only of those claims “arising under or growing out of any treaty or agreement between the United States and the Seminole Indian Nation or Tribe, or arising under or growing out of any Act of Congress in relation to Indian Affairs.” It says a claim arising out of a breach of a fiduciary duty is not one arising out of a treaty or an act of Congress. We do not think this defense is good. If the defendant has ever owed plaintiff the duty of a fiduciary, it owed it this duty when the treaties were signed and the Acts were passed on which plaintiff sues. Implicit in those agreements and in the Acts was the obligation to carry out their terms with the fidelity a fiduciary owes his ward. If in paying the amounts it had promised to pay, it paid them to a person it knew would misappropriate them, defendant has not discharged the obligation it undertook.
*603 We do not understand this holding to be in conflict with what we said in Choctaw and Chickasaw Nations v. United States, 75 C. Cls. 494, nor with the Supreme Court’s decision in Creek Nation v. United States, 318 U. S. 629. It is in line with our decision in Menominee Tribe of Indians v. United States, 101 C. Cls. 22.
Since we think we have jurisdiction to render judgment for the payments claimed in item 5 on the ground that the General Council was corrupt and that at the time they were made the defendant knew this to be so, we shall consider the case on its merits.
First, as to fraud and corruption during the period from 1870 to 1874. The only evidence of corruption and fraud before the Commissioner of Indian Affairs at the time he authorized the payments to the tribal treasurer during this period, as requested by the General Council of the tribe, were the reports of the Indian Agent, Captain Baldwin. We do not consider the reports of John P. C. Shanks, dated August 9, 1875, and of A. B. Meacham, dated November 20, 1878, because they were received after the payments were made and, therefore, could not have charged the defendant with knowledge of any corruption and fraud at the time the payments were made. '
Agent Baldwin assumed the duties of Indian Agent in July 1869. On November 3, 1869, he recommended that the next annuity payment be paid to the chiefs to pay their national debt, which seems to have been for salaries due the tribal officials, since, he said, “the amount appropriated for the support of the Seminole Govt., [sic] is not adequate.” (This amount was fixed at $1,000 per year by the treaty of 1856.)
On December 6, 1869, he renewed this recommendation, stated what the national debt was, and for what contracted, but called attention to the fact that “they are in the habit of calling councils for any little thing that may arise and spending from 2 to 15 days without effecting anything whatever which would be of the least service to the nation, except in spending the funds.” He, therefore, recommended that it be determined what amount was to be turned over to the General Council in the future and what amount was to be *604 turned over to heads of families, so that the chiefs and lawmakers would have no encouragement to run up these debts.
Thereafter, in the years 1871, 1872, 1878, and 1874, it became the practice to turn over to the General Council every other payment. It is for these payments and the payments made in 1870 that plaintiff sues.
It will be observed that Captain Baldwin did not recommend that none of these annuities be turned over to the General Council, but only that the amount to be turned over be definitely fixed. He had recommended a month earlier that some amount be turned over to them, “since the amount appropriated for the support of the Seminole Govt., [sic] is not adequate.”
About a month later, on January 12,1870, he recommended that the next annuity payment be paid per capita because needed to protect the people from the rigors of the winter season.
Six months later, on June 30,1870, he again recommended that the annuities be paid per capita because the 68 chiefs and lawmakers had received the bulk of the $25,000 paid within the last year. (His report of May 1,1870, shows that only $7,179.25 of the $25,000 had been paid per capita.)
On September 1, 1870, he stated “per capita payments are, in some instances, I think, a great evil,” but he recommended that until the system could be abolished all annuities be paid per capita, since few of the people had been receiving “the bulk of their annuities.”
On November 17, 1870, he wrote the Commissioner of Indian Affairs with reference to a request of the chiefs that the next payment of annuities be made to the officers and lawmakers. He said that when the last payment was made that the' people needed many of the necessities of life, but that “a few leaders or chiefs pocketed the bulk of the annuities while the people received but a small portion.” He, therefore, recommended that the next payment be made, per capita.
The substance of all of Captain Baldwin’s recommendations is that, while he believed some of the annuity payments should have been paid for the support of the govern *605 ment of the tribe, he thought too much of them had been devoted to that purpose.
In the next year, one-half of the annuities were paid to the tribal treasurer and one-half per capita. Indian Agent Breiner, who succeeded Captain Baldwin as Indian Agent, recommended that this practice be continued. In his letter of May 31,1871, he said that he paid the sum deposited to his credit for the use of the Seminóles in settlement of their national debt, and that “It was understood by the whole nation that this payment was to be made in this way, and I have heard of no complaints against it. But it is understood, and so stated to me by the chief, that the next payment is to be made per capita.”
In his letter of December 20,1871, he said:
* * * I am not fully convinced that the Seminóles are capable of managing their financial affairs economically and advantageously; yet if the Honorable Commissioner should authorize the agent to make the payments to the treasury it would relieve him of much writing but if we take their interests into consideration I would say that they be advised from the Department to allow the payments to be made as usual, i. e., every alternate payment to be made per capita and the other payments to be paid to the treasury for Government purposes.
Finally, on January 31, 1874, this agent wrote the Commissioner of Indian Affairs in part as follows:
The Seminóles are beginning to feel that they are capable of managing their financial affairs without the aid of an agent, and hence the demand to have the whole of their annuity paid into their treasury. On account of their urgency I may have concurred in this demand, and recommended that their request be complied with, while at the same time I was fully convinced that they are not capable of managing their affairs to the best advantage ; yet I believed, and still believe that they would be advised by me in matters of importance; and that, by allowing them to have the control of, say half their annuity, as recommended in my communication of the 1st inst., they would take a pride in making improvements, and in adopting a better system of education, and thus they would acquire a better and more practical knowl *606 edge of the management of their financial affairs than they ever could under the present management. But if they refuse to be advised, it would prove a failure, for they have, in common with all Indians, very little idea of the value and uses of money.
This, then, was the information before the Commissioner when he authorized the payments to the tribal treasurer: protests by Captain Baldwin in 1870 that too much was being paid on order of the General Council for the benefits received from the payments, and a recommendation from the succeeding agent that every other payment be made to the treasurer, which was done.
We do not think it can be concluded from this that the Commissioner of Indian Affairs had knowledge of the fact that the General Council was corrupt, venal, and false to its trust. He had reason to believe that the chiefs and lawmakers put too high a value on their services to the nation, that they wanted their own services paid for, even if the other members of the nation needed the money more than they did, and that they were overanxious to render services and run up bills against the nation. Such charges are not infrequently leveled at the law-making bodies and public officials of the white man; but they do not amount to charges of corruption, venality, and fraudulent breach of trust.
Nor can we say that the Commissioner permitted these chiefs and lawmakers to run riot with the tribal funds. He may have allowed them too great a share of them, but what he did allow was that recommended by his agent on the ground, and there is nothing to show that this agent did not act in good faith.
It is hard to believe that the Commissioner of Indian Affairs and the Secretary of the Interior would have made to Congress the recommendation they did on January 9,1874, if they had believed the General Council was corrupt. On that date, on the recommendation of the Commissioner of Indian Affairs, the Secretary of the Interior wrote the Speaker of the House in part as follows:
The Seminóles are considerably advanced in civilization, and have a national government, and as a nation are desirous of having the whole amount accruing an *607 nually upon the sum invested as above described, or at least a large portion thereof, paid into the national treasury of their nation, to be disposed of under the laws of the nation, for such purposes connected with their civilization and improvement as the national council may deem best.
I have no doubt of the propriety of complying with their wishes, at least to some extent, and I am equally clear that such portion of their annuities as is not paid into the National Treasury should be expended by the Indian Office, with the sanction of the Secretary of the Interior and the President of the United States, in'promoting the general comfort, civilization, and improvement of these Seminóles. In this connection I deem it my duty to refer to a recommendation contained in my annual report, namely, that all annuities, instead of being paid to Indian tribes per capita, be expended, as here indicated, in promoting their general welfare, civilization, and improvement. The payment of cash to individual Indians has, according to all the experience furnished by the Indian Office, tended to produce debauchery and demoralization, rather than to advance the civilization or improvement of Indian tribes.
On this recommendation Congress passed the Act of April 15, 1874 (c. 97, 18 Stat. 29), which expressly authorized the Commissioner of Indian Affairs to pay the annuities “into the treasury of the Seminole Nation to be used as the Council of the same shall provide, instead of paying the same per capita according to the terms of said treaty.”
We cannot believe any such authority would have been granted by Congress if it had reason to believe the Council was corrupt, venal, and false to its trust.
In the foregoing discussion we have not considered the report to the Commissioner of Indian Affairs of John P. C. Shanks, tjie comments on that report by George A. Ingalls, Indian Agent, Union Agency, nor the report of Special Agent A. B. Meacham, because none of these reports were before the Commissioner when he authorized the payments in question to the tribal treasurer.
Shanks, in his letter of August 9,1875, paints quite a lurid picture of oppression of the people by the chiefs, but a good deal of doubt as to the bona fides of this report is raised by the statement of Agent Ingalls, who says Shanks asked him *608 to tell the Seminóles what he had done for them for the purpose of trying to induce them to agree to his employment as attorney for the Five Civilized Tribes.
Of the men charged with oppression by Shanks, and especially criticized by plaintiff in its brief, Ingalls said:
I have had considerable business relation with John Chupco, Chief, Col. John Jumper, 2d Chief, James Factor, Treasurer, and with all other officers of the Seminole Nation and I have never known either of them to speak falsely or misrepresent matters concerning themselves or others and I believe all of them to be honorable gentlemen.
Meacham in his report of November 20,1878, also says the chiefs were trying to “gobble” the money belonging to the people; but the Commissioner of Indian Affairs, with these conflicting reports before him, continued from 1874 on to make payments of a part of the annuities to the tribal government, and plaintiff in its petition does not complain thereof.
It is not unreasonable to believe that there were some in the tribe who would have “gobbled” all the money if they could have, but we are not convinced that the Commissioner of Indian Affairs permitted them to do so, nor that he paid to them more than was proper in his honest judgment to be expended by the tribal government.
Next, as to payments made from 1899 to 1907. To show corruption and fraud from 1899 to 1907 plaintiff cites, first, the reports of the Dawes Commission of November 20, 1894, and of November 18,1895. That Commission was appointed pursuant to section 16 of the Appropriation Act of March 3, 1893 (27 Stat. 612), for the purpose of securing an agreement from the Five Civilized Tribes for the extinguishment of the title of the tribes to lands within the Indian territory so that a State embracing these lands could be created. In its report to the Secretary of the Interior dated November 20,1894, the Commission said:
Corruption of the grossest kind, openly and unblushingly practiced, has found its way into every branch of the service of the tribal governments. All branches of the governments are reeking with it, and so common has it become that no attempt at concealment is thought *609 necessary. The governments have fallen into the hands of a few able and energetic Indian citizens, nearly all mixed blood and adopted whites, who have so administered their affairs and have enacted such laws that they are enabled to appropriate to their own exclusive use almost the entire property of the Territory of any kind that can be rendered profitable and available.
And in its report of November 18, 1895, it said:
The Commission is compelled by the evidence forced upon them during their examination into the administration of the so-called governments in this Territory to report that these governments in all their branches are wholly corrupt, irresponsible, and unworthy to be longer trusted with the care and control of the money and other property of Indian citizens, much less their lives, which they scarcely pretend to protect.
These charges are directed at the five tribes indiscriminately and without making any exception. It would appear, however, that the Commission either did not mean to include the Seminóles in the indictment or that at the time it was unacquainted with' conditions in this tribe, because in the part of its annual report for 1899 dealing with the enrollment of citizens of the tribe preparatory to making allotments of land to them it said:
The Seminóles, as has already been seen, are the fewest in numbers of the Five Tribes, and their government has been free from corruption. The rolls of the tribe, while crude in a measure, were found free from all irregularities of a fraudulent character.
Furthermore: As a result of the reports of the Dawes Commission, Congress, in the Appropriation Act of June 7, 1897 (30 Stat. 62, 84), enacted that all the Five Civilized Tribes should certify all their acts and resolutions to the President of the United States and that these acts should not take effect if disapproved by him or until 30 days after their passage if the President failed to act upon them in the meantime. But when the Commission came to make an agreement with the Seminóles about six months later, on December 16,1897, they incorporated therein this provision:
. When this agreement is ratified by the Seminole Nation and the United States the same shall serve to repeal all the provisions of the Act of Congress approved June *610 seventh, eighteen hundred and ninety-seven, in any manner affecting the proceedings of the general council of the Seminole Nation.
This agreement was ratified by Congress on July 1, 1898 (30 Stat. 567). This tribe was evidently exempted from the requirement for Presidential approval of the acts of its General Council for the reason that its General Council was believed to be trustworthy and, hence, did not need Presidential supervision.
Thus it appears that the reports of this Commission, instead of proving that the General Council was corrupt, testify to its fidelity to its trust.
Indeed, plaintiff points to no specific act of the General Council as being corrupt; it confines itself to undertaking to show that the Principal Chief (sometimes called “Governor”) and Treasurer were corrupt in their dealings with the people, and that the General Council was dominated by them. To prove this, plaintiff says these men issued scrip to the Indians in advance of the annuities they were due to receive, which were redeemable only in merchandise at one of the two stores run by these two men; that a discount of from 10 to 20 percent was charged, and that the prices charged for the merchandise were from 25 to 50 percent higher than at othei stores, and that the Indians were forced to accept this scrip whether or not they wanted it. Plaintiff also charges that the Governor and Treasurer misappropriated $191,294.20 of the tribal funds, and that they acquired from the tribe the Wewoka townsite lots at a fraction of their value. It also complains of the action of Andrew J. Brown, the Treasurer, in the Loyal Seminole Payment matter.
John F. Brown was the Principal Chief, and his brother, Andrew Jackson Brown, was Treasurer. They were half-breeds. The charge that they misappropriated $191,294.20 of tribal funds is supported only by a charge that this money never entered the treasury, which was made by a group of 100 men of the tribe who are said to have met to protest against the agreement of December 16, 1897, negotiated by the Dawes Commission. In the resolutions adopted they said this money never found its way into the treasury and that the only explanation offered therefor by the authorities *611 was that it was paid to a lawyer who negotiated the 1889 agreement for the sale of some of their lands to the United States, and that they were not given the name of the lawyer nor shown his receipt for the money.
There is nothing in the record to support this charge. There was evidently nothing to it, because with this charge before it Congress ratified the agreement on July 1, 1898, knowing at the time that John F. Brown was still Principal Chief and that A. J. Brown was Treasurer.
Nor is there anything in the record to support the charges made in the Memorial to Congress signed by A. W. Crain, B. F. Bruner, Nero Noble, Geo. Ripley, Alex Harjo, and John Jefferson, in which it is charged, among other things, that a few Indians had amassed large fortunes, and had brought their tribe to poverty. Crain was John F. Brown’s brother-in-law, but had been at enmity with him for many years. Whether this had anything to do with the charges, we do not know.
In Seminole Nation v. United States, 92 C. Cls. 210, we held that plaintiff had not proven that the sale of the Wewoka townsite lots was fraudulent. Certiorari was denied, Seminole Nation v. United States, 313 U. S. 563.
There is no proof in the record to support the charge of wrongdoing by Andrew Jackson Brown in the Loyal Seminole Payment matter. The only thing reflecting thereon are certain statements in a brief filed by P. L. Soper, Special Assistant United States Attorney, in support of exceptions taken to the confirmation of a report by A. J. Brown, who seems to have been appointed administrator for certain deceased and incompetent persons among the Loyal Seminóles. This, of course, is no proof at all. What action the court took on the exceptions we are not told.
Plaintiff relies principally on the issuance of this scrip, called by the Indians “chokasutka,” to show that the tribal officers were mulcting the nation. It charges that a discount was deducted, that the Indians were forced to take the scrip, and that the goods in which it alone was redeemable were sold at exorbitant prices.
The commissioner of this court has found that no discount was charged, but we think the preponderance of the evidence *612 shows that it was. There is some dispute as to the amount of it, but the greater weight of the evidence shows that it was 10 percent.
There is no proof to show the Indians were required to take this scrip whether or not they wanted it. If they wanted merchandise and did not have the money to pay for it, they could go to one of these stores and get this scrip up to the amount of the next annuity payment to which they were entitled, less the discount charged; but there is no proof whatever that they were forced to do this. They could get it or not as they wished.
There is filed in evidence a photostatic copy of an account book kept by A. J. Brown, the treasurer, showing payments made to members of the tribe. This book is explained by a former employee of the Wewoka Trading Company, Allen W. Crain, and by Mrs. John W. Wihnott, another former employee. At the time these former employees testified both of the Browns were dead. On the account book are listed the names of members of the different bands. In the columns headed “W” and “S” are entered certain figures. These, it is explained, show the amount of chokasutka issued to the individuals at the Wewoka and Sasakwa stores run by the Browns. The figures in the column to the left of the column headed “W” show the cash paid. The first item on page 56, for example, shows $12.00 was paid to “Jennie” in cash and $2.00 issued to her in scrip at the Wewoka store; the next four drew their entire annuity in scrip; the next one drew $8.00 in cash and $6.00 in scrip; the next two drew their entire annuity in cash; the next five drew all their annuity in scrip; the next two in cash; the next one drew $10.00 in cash and $4.00 in scrip; and so on.
It is apparent from this that the Indians were not forced to take their annuity in scrip. They could get either scrip or ■cash as they wished. o
This refutes the statement of Delegate Flynn made on the floor of Congress, whatever probative value it may have, that “This money is paid to Jackson Brown, the treasurer, and the Indians never see a dollar of it, but the Browns issue to the Indians due bills good for so much goods at the Brown *613 store.” It would appear that his statement was more oratorical than accurate.
There is little, if any, credible evidence that exorbitant prices were charged for the merchandise sold. There is in evidence a report, dated February 26, 1912, to the United States Indian Superintendent at Muskogee, Oklahoma, made by a man whose signature is illegible, but who signs himself “probate attorney,” which gives a comparison of the prices charged at that time by the Wewoka Trading Company, which did a credit business, and by a man named Yarnum, who sold for cash. It relates to a time after the period in question and, of course, is not competent evidence; we refer to it because it is the only definite statement in the record reflecting at all on the charge of exorbitant prices. There is some testimony by several members of the tribe that the We-woka Trading Company did charge higher prices, but their testimony is so general and vague that it is of no real assistance. The probate attorney’s report shows that the prices charged for lard, coffee, and rice were the same. The We-woka Trading Company charged slightly more for beans. It charged for cornmeal 45 cents against 35 cents; 7 to 8 cents for sugar against 6% cents; 13% to 14 cents a pound for salt meat against 10 cents; and $3.00 a cwt., for flour against $2.40 to $2.70.
We have a suspicion that higher prices were charged during the period in question, but there is no competent proof worthy of belief to show that they were exorbitant.
We have, then, the oft-encountered practice of merchants •dealing with customers who were ignorant and shiftless, who lived only from day to day, who never laid up a cent but were always in debt. Commissaries of logging camps, mines, factories, etc., have long engaged in the practice followed here. These even paid off their workers in scrip. The tenant farmer, as a class, is never out of debt to the landowner or the merchant or the banker, and high rates of interest are charged him. In later years the laws of the States have done much to correct the practice, but it was by no means uncommon forty or fifty years ago. The Department of the Interior corrected that practice of these two stores when it was brought to its .attention.
*614 In 1905 Henry C. Lewis, an investigator for the Department of Justice, was sent to Wewoka to make an investigation of this practice. He reported in part as follows:
When the credit is extended they are given a book containing the due bills and in this book is entered the particular appropriation which is to cover the advance in goods and the amount of advance so given, which of course, is the same amount as is given m due bills, so that when the Indians ask for $50.00 in credit upon a certain appropriation they are debited on the books of the company with fifty dollars, but are given only forty-five dollars in due bills, and consequently, get only that amount in goods. * * *
$ ‡ *
* * * To charge a discount where goods are given on credit is not unusual, but the system under which it is charged by this company is manifestly unfair, for the reason that when the money is received by the Trading Company the Indians may not have traded out all of the due bills which have been given them, or, in other words, all of the credit extended to them. The result is that a discount has been charged on a part, at least, of the amount given out in due bills, goods for which have not been obtained, while as a matter of fact, the Trading Company has the money in its possession representing such part for which goods have not been obtained, the Indians retaining the remaining due bills to be traded out in the future. It would seem that there should be a discount in favor of the Indians instead of the Trading Company. The Indians are at liberty to turn in the remaining due bills, states Mr. Brown, but they never do so, another result of their pitiable ignorance. Indeed, some of them do not even understand what these due bills represent when they receive them. There is in the record the testimony of one girl who stated that she did not know what the due bills were and threw them away. In point of fact, she threw away so much money. It is not too much to say that, in view of the ignorance of these Indians, this system of credit is dishonest. It should be condemned because it keeps these Indians in a constant state of poverty. They do not realize that these due bills are in fact money, and the result is that they are squandered without care. I am not informed as to whether the Department of the Interior has knowledge of this- state of affairs. It should be brought to its attention, so that, if possible, it may take steps looking *615 to the breaking up of the system, which can be done by having the appropriations distributed in some other manner.
Upon receipt of this report the Commissioner of Indian Affairs recommended to the Secretary of the Interior that the practice be prohibited. The First Assistant Secretary of the Interior replied on April 26,1906, in part, as follows:
You express the opinion that the Department cannot, control the manner in which the Wewoka Trading Company transacts its business, but recommend that hereafter, when payments are made to Seminóles, such payments be made direct to the adult citizens and to the-guardians of minors, and that during the time such payment is being made no member of said company or any of its agents or employes be allowed to be present.
In this the Department concurs, and such course should be followed hereafter, should no objections appear.
It is not considered advisable, as you suggest, to instruct the U. S. Indian Inspector for the Indian Territory to advise the Wewoka Trading Company “that the Department does not like its method of issuing coupon books and charging discounts, and that the Department would prefer that said business, in so far as the Seminóles are concerned, be transacted in the usual way and discounts and coupon books be not used or considered in the transaction of business of said company with Seminole Indians.”
It thus appears that as soon as the Commissioner of Indian Affairs and the Secretary of the Interior had definite knowledge of this practice they put an end to it.
Even though the Commissioner of Indian Affairs had continued to make these payments to the tribal treasurer with knowledge of the fact that the Wewoka Trading Company, which was owned by the Principal Chief and Treasurer, was extending credit to the Indians at this discount, we would not conclude that the payments had been made by the defendant with knowledge of the fact that the tribal officials were mulcting the nation. We are not at all sure the individual Indian would have been better off if the annuities had been paid to him in cash and he had been prohibited from pledging his annuity payments to secure credit. In all probability, as soon as the money was received it would *616 have been spent for this and for that, leaving him in dire need of credit until the next payment came due. In 1874 the Secretary of the Interior wrote a letter to the Speaker of the House in which he said:
The payment of cash to individual Indians has, according to all the experience furnished by the Indian Office, tended to produce debauchery and demoralization, rather than to advance the civiliation or improvement of Indian tribes.
During the years in question defendant paid to the tribal treasurer $864,702.58. We cannot say the defendant .should pay this money again because the treasurer of the tribe, as a merchant, extended credit to the members of the tribe on the faith of the annuity payments at 10 percent discount, with the defendant’s knowledge. But whether or not this is so, it definitely appears that as soon as the defendant acquired knowledge of the practice it no longer paid the per capita payments to the treasurer, but paid them to the Indians direct. In no event could defendant be liable for payments made in the absence of knowledge of the practice.
Of the total amount paid, $622,145.87 was paid the tribal treasurer pursuant to the direction of Congress in section 12 of the Act of March 2, 1889 (25 Stat. 980). Until this Act was repealed by the Act' of April 26, 1906 (34 Stat. 137), which abolished the tribal governments, the Commissioner of Indian Affairs had no discretion to do anything other than to pay this money into the tribal treasury. We have no reason to believe that when Congress passed the Act of 1889 it was aware of corruption in the General Council of the tribe or that the tribal officials were mulcting the people.
We are of opinion the plaintiff is not entitled to recover on item 5.
CASE L-208
By an amended petition filed in this court on December 27, 1937, in case L-208, plaintiff seeks to recover the value of 11,550.54 acres of land. It is alleged that under the third article of the treaty of March 21, 1866 (14 Stat. 755), the defendant had conveyed to plaintiff a 200,000-acre tract of land immediately west of the Creek lands, but that when the *617 boundaries of this tract were surveyed and laid off the amount included therein was 11,550.54 acres short of 200,000 acres,, and that this shortage had been allotted to members of the Pottawatomie tribe and patented to white settlers.
The parties agree that the tract between the Bardwell line, which is the eastern boundary of the original Seminole tract, and the Bobbins line, which is the western boundary of the tract, contains only 189,648.18 acres; in other words, that the 200,000-acre tract was short 10,351.82 acres. They also agree that this was due to the incorrect location of the Bobbins line and that plaintiff is entitled to recover the value of the shortage at the time it was taken by the defendant. They disagree as to the time of the taking.
The defendant says it took the lands at the time it set them apart as a reservation for the Pottawatomies. This was done under the following circumstances:
On February 27, 1867 (15 Stat. 581), the defendant had entered into a treaty with the Pottawatomies, under article I of which it was agreed that a commission representing the United States and a delegation of the Pottawatomies should visit the Indian country “in order to select, if possible, a suitable location for their people without interfering with the locations made for other Indians; and if such location shall be found satisfactory to the Pottawatomies, and approved by the Secretary of the Interior, such tract of land, not exceeding thirty miles square, shall be set apart as a reservation for the exclusive use and occupancy of that tribe; and upon the survey of its lines and boundaries, and ascertaining of its area, and payment to the United States for the same, as hereinafter mentioned and set forth, the said tract shall be patented to the Pottawatomie nation.” Pursuant thereto the Indian country was visited shortly prior to February 24, 1870, and a tract of land was selected which lay immediately west of the Seminole country. Beport of this was made to the Secretary of the Interior, who approved the selection on November 9, 1870, in a letter to the Commissioner of Indian Affairs, the last paragraph of which reads as follows:
I hereby approve the selection made, and give the authority for the removal of the Pottawatomies as recommended by you, with the direction that, until the *618 western boundary of the Seminole country is surveyed and marked, tbey will locate so far west of that tribe as not to intrude upon their lands.
Subsequently, Nathaniel Robbins surveyed and marked the western boundary of the Seminole tract. The report of his survey was made on January 5, 1872. It was approved by the Secretary of the Interior on February 5,1872. Thereafter, the Pottawatomies occupied the lands up to the west of this line, but it does not appear that a patent to the lands was ever issued to the nation as provided for in the treaty.
At the time the Robbins’ report was made and approved it was thought that the Robbins’ line had been located so as to enclose between it and the Bardwell line a tract of 200,000 acres, but it was discovered that it did not when the defendant made a geological survey of the lands in the years 1895 and 1896, and it then became known that the Potta-watomies may have been settled on part of the Seminole lands.
In the meantime the Pottawatomies, by an agreement ratified by the Act of March 3,1891 (26 Stat. 989,1016'), had ■ceded to the United States the lands assigned to them under the treaty of February 27,1867, supra. The agreement and ratifying Act provided for allotments of portions of these lands to the Pottawatomie Indians in severalty and for the ■opening of the balance to settlement by white settlers. Believing at this time that the 10,351.82 acres, in issue here, belonged to the Pottawatomies, the defendant in 1892 allotted 3,818.21 acres of them to members of this tribe, and from 1895 to 1913 it patented the balance to white settlers. Later the ■defendant discovered that these lands belonged not to the Pottawatomies but to the Seminóles, but it took no action to cancel the allotments to the Pottawatomie Indians and the patents to white settlers, and none is contemplated; instead defendant admits plaintiff is entitled to recover the value of the lands in this suit.
Under the foregoing facts we are required by the opinions of the Supreme Court in Creek Nation v. United States, 295 U. S. 103, and 302 U. S. 620, to hold that the defendant exercised ownership over and appropriated to its own use these lands from the date it allotted them to the Pottawatomies in severalty in 1892 and from the dates of the patents to white *619 settlers, as set out in finding 27. There is no material distinction between the facts in the Creek case and in this.
In the Greek, case the Sac and Fox Indians were inadvertently located on a part of the Creek lands due to an erroneous survey of the boundary between the Creek lands and that of the Sac and Fox. This boundary line was run by one Darling. He placed it east of a line previously run by Bardwell. In 1889 the United States and the Creeks agreed on the Bardwell line as the correct boundary (Act .of March 1, 1889, 25 Stat. 757), but nevertheless the Sac and Fox Indians by an agreement ratified on February 13, 1891, ceded to the United States certain lands described by metes and bounds (26 Stat. 749,750), which either actually included the Creek lands between the Darling and Bardwell lines or was thought to include them, and these lands were allotted to Sac and Fox Indians and patented to white settlers. The Supreme Court held that there had not been a taking in 1873 when the Sac and Fox Indians were erroneously settled on these Creek lands, but that the taking occurred when the lands were disposed of to persons other than Creek Indians pursuant to the agreement ratified by Congress under which the lands were ceded to the United States. This was held to be a taking, since no action was taken to set aside the allotments and the patents upon discovery of the error.
So in the case at bar the settlement of the Pottawatomie Indians on the Seminole lands in 1872 as the result of an erroneous survey did not constitute a taking of these lands. The lands were not taken until the United States disposed of them pursuant to the agreement with the Pottawatomies under which they were ceded to the United States.
Defendant says the Creek case is not controlling because in that case Congress by the Act of March 1, 1889 (c. 317, 25 Stat. 757), repudiated the erroneous survey; whereas, Congress expressly adopted this erroneous survey by the Act of March 3, 1891, supra. This, however, is a distinction without a difference, because, while Congress first repudiated the erroneous survey in the Creek case, it later accepted a cession of lands included within the erroneous survey, as was done in the case at bar. Furthermore, Congress’ adoption of the erroneous survey in both cases- was done in *620 ignorance of the fact that they were erroneous. Their adoption in such circumstances could not be a taking, because the intention to take was lacking. In this case, as in the Greek case, there was not a taking until the patents were issued and until the failure of Congress to direct their cancellation after it was discovered that they were issued on lands belonging to the Seminóles.
The defendant says that under the authority of Shoshone Tribe of Indians v. United States, 299 U. S. 476, the taking occurred when the Pottawatomies were settled on the land in 1872. In that case plaintiff had the right of use and occupancy only; in this case the plaintiff owned the fee in the lands. This right of use and occupancy in the Shoshone case was first impaired when the Arapahoes were settled on their lands, over the protest of the Shoshones, and, hence, it was held that their rights in the lands had been taken as of this date. In the case at bar plaintiff does not sue for its loss of use and occupancy while the Pottawatomies occupied the lands as a reservation; it claims the fee and sues because it has been divested of this fee. It is entitled to recover as of the date of the divestiture. This occurred when the lands were disposed of pursuant to the agreement with the Pottawatomies under which the Seminole lands were conveyed to the United States.
If I, through mistake, erect a structure on land my neighbor owns in fee, or otherwise occupy it, I have not taken his land, unless after discovery of the error I refuse to remove from it. On the contrary, if my neighbor has only a lease on the lands he occupies and does not own the title, and I erect a structure on his lands over his protest, then I have taken from him the only interest he has in the lands, the right of use and occupancy, from the date I erected the structure on it. This, it would seem, is the distinction between the Greek case and the Shoshone case.
At any rate, it would seem clear that the Supreme Court in the Shoshone case did not intend to overrule the Greek case. Instead, it suggested a comparison between the two cases; it evidently did not think they were in conflict with one another ; and at the nest term of the court after the Shoshonef> opinion, the opinion in Creek Nation v. United States, in *621 295 U. S. 103, was expressly approved and adopted. See Creek Nation v. United States, 302 U. S. 620.
Since the facts in the Greek case and in the case at bar are the same, we hold that this case is ruled by the decisions in the Greek case.
There is much conflict in the testimony over the value of these lands from 1892 to 1913. The values testified to by the witnessess range from $3.50 an acre for the uplands to $30.00 an acre. The highest value put on the bottom lands was $50.00 in 1892, and from $75.00 to $100.00 from 1900 to 1910.
There is in the record, however, evidence more reliable than that of the testimony of witnesses as to values forty to fifty years prior to their testimony.
From 1895 to 1900, 1611.12 acres of the 10,351.82 were patented, and from 1901 to 1906, 4,441.32 acres were patented. During the years 18'94 to 1901 the Pottawatomie and Absentee Shawnee Indians disposed of 90,447.86 acres, or about y6 of their allotments, at prices averaging $5.52 an acre, and the sales at these prices were approved by the Secretary of the Interior. From 1901 to 1906 they disposed of 67,841.82 acres at prices averaging $8.22 an acre, and the sales at these prices were approved by the Secretary of the Interior. This is a weighted average of $7.50 per acre. This seems to us the best evidence of the value of the lands during these two periods. In 1892, 3,818.21 acres were allotted to the Indians. There were no sales of comparable lands in that year, but we assume their value was substantially the same as in the period 1894 to 1901.
Actual sales of large tracts of comparable lands, therefore, establish an average value of about $7.00 per acre throughout the period from 1892 to 1906. Less than 500 acres were disposed of thereafter. We are of opinion from all the testimony that a valuation of $7.00 an acre for all the lands throughout the whole period from 1892 to 1913 is fair and equitable.
It results that the plaintiff is entitled to recover from the defendant for the taking of this tract of land $72,462.74, plus such amount as will produce the present full equivalent of the value of the land if paid contemporaneously with the taking. In determining this amount we have computed in *622 terest on the value of the land at the time of the taking at 4 percent per annum, which is the rate the Government in agreements with Indian tribes in the period between the taking and today has agreed to pay on Indian funds in its hands. We have computed interest at this rate from 1899, by which time about one-half of the acreage had been allotted or patented, to date of judgment. This amounts to $130,215.54.
It results that plaintiff is entitled to recover in this suit the total sum of $202,678.28.
gratuities
On the former hearing of case L-51 we found the defendant was indebted to the plaintiff in the sum of $18,388.30, and this was affirmed by the Supreme Court. This figure, added to the amount of the recovery allowed in case L-208, makes a total recovery of $221,066.58. Against this amount defendant first claims an offset of $31,083.79 (finding 30). The plaintiff admitted on the former trial (93 C. Cls. 525) that the defendant was entitled to this offset, and it was allowed by us. We reaffirm that holding.
Defendant’s following offsets are claimed under the provisions of the Act of August 12, 1935 (49 Stat. 571, 596), under section 2 of which this court is directed in any suit brought by an Indian tribe against the United States “to consider and to offset against any amount found due the said tribe or band all sums expended gratuitously by the United States for the benefit of said tribe or band.”
Defendant’s first claim under this Act is for the sum of $175,000 which was paid the Creek Nation for lands purchased from it and given to the plaintiff nation in addition to the tract of 200,000 acres which the defendant was obligated to give it under the treaty of 1866.
By the third article of the treaty of March 21,1866, supra, heretofore referred to, it was recited that the defendant had secured from the Creek Nation the westerly half of their lands, and defendant agreed to convey to plaintiff so much of these lands as lay between the lands retained by the Creeks and between the Canadian River on the south, and the north fork of the Canadian River on the north, and a line *623 drawn on the west at such place as would include 200,000 acres of land. Prior to the time that the boundary line between the Creeks on the east and the Seminóles on the west had been run, the defendant found it desirable to move the Seminóles,, who were then refugeeing in Kansas, to their domain. When the boundary line between the Creeks and Seminóles was-finally definitely established it was found that through error-some of the Seminóles had been settled on a part of the lands, retained by the Creeks. In the meantime the Seminóles had made improvements on these lands, and for this reason the defendant wished to avoid moving them from these lands-to their own domain. Hence, Congress, by the Act of March 3, 1813 (17 Stat. 626), authorized the Secretary of the Interior to see if he could induce the Creeks to sell to the United ¿States 175,000 acres of the land retained by them, and to give these lands to the Seminole Nation in addition to the-200,000 acres which the defendant was obligated to give them by the treaty of 1866. Pursuant to this authorization the Secretary purchased from the Creek Nation 175,000 acres-of land for the sum of $175,000, and these lands were conveyed to the plaintiff tribe in addition to the 200,000 acres-(The actual number of acres conveyed was 177,397.71, due to-an erroneous survey.) The defendant claims an offset of this amount under the Act of August 12,1935, supra.
The defendant was under no obligation to grant to the plaintiff tribe more than 200,000 acres. When it discovered' its error in locating the Seminóles on Creek lands, it was under the obligation of removing them to their own domain. The erroneous settling of them on the Creek lands created no-obligation on its part to secure these lands for them; nor was-it legally responsible for the damages incurred by the plaintiff tribe as a result of the acts of its officers and agents in erroneously locating them on the Creek lands. Certainly it incurred no liability on account of the alleged promises of these officers to the plaintiff tribe that they would protect them from loss on account of the improvements they had made on the lands. No officer, of course, has the power to bind the United States, in the absence of congressional authority to do so, and it is not even contended that Congress authorized these officers to make any such promise nor that it directed them *624 to locate the plaintiff tribe on the Creek lands. Cf. Shoshone Tribe v. United States, 299 U. S. 476, 494; United States v. North American Co., 253 U. S. 330, 333.
Congress, when it enacted the Act of March 3,1873, supra, authorizing the purchase of this additional 175,000 acres of land, was not discharging any legal obligation incurred; its only legal obligation was to give the Seminole Nation the 200,000 acres of land it had promised it, not 375,000 acres. It recognized, however, that an unfortunate error had been made, and in a spirit of generosity, not because it was under the legal duty to do so, it decided to buy the lands and give them to plaintiff. This was a gratuitous act, the cost of which we are required by the Act of March 12,1935, to offset against any amount due the tribe.
We hold, therefore, that the defendant is entitled to an offset of the amount paid for this additional acreage, to wit, $175,000.00. (See 93 C. Cls. 526).
In our former opinion in this case (reported in 93 C. Cls. 500, 511-515, as amended by our opinion on motion for a new trial, 93 C. Cls. 534-537) we allowed certain offsets, as set out in findings 11 to 19 of that opinion. In its brief on this trial of the case defendant asked that we allow the same offsets. The plaintiff in its brief on this trial does not mention this part of the case, but in its former brief it covered it fully.
In our former opinion we allowed the following items which plaintiff vigorously opposed: “Pay of Indian Agents,” “Pay of interpreters,” “Pay of miscellaneous employees,” “Fuel, light, and water,” “Transportation etc. of supplies.” After setting out plaintiff’s contentions with reference to these items which, in brief, was that these expenditures were required by treaty, we said:
However persuasive this argument may once have been, this question has heretofore been decided adversely to the plaintiff by the cases of Blackfeet, et al. Tribes v. United States, 81 C. Cls. 101, 137, and Shoshone Tribe v. United States, 82 C. Cls. 23, 93. We hold accordingly that the defendant is entitled to these offsets.
We have reviewed our holding on these items [See 93 C. Cls. 529] and have concluded that we were in error.
*625 On August 7,1856, the United States entered into a treaty with the Creek and Seminole Tribes of Indians (11 Stat. 699), the preamble of which recited that it was desirable that all the treaty stipulations between the parties be incorporated into one comprehensive instrument. In that document there was definitely set out and described the Creek territory and the Seminole territory. In Article XV it was provided, among other tilings: “* * * all persons not being members of either tribe, found within their limits, shall be considered intruders and be removed from and kept, out of the same by the United States agents for said tribes, respectively: (assisted, if necessary, by the military;) * * Under Article XVII the United States agent was required to issue a license to anyone to trade with the Creeks and Seminóles and to approve the compensation to be paid by them for the land and timber they should use. Article XVIII provided in part: “The United States shall protect the Creeks and Seminóles from domestic strife, from hostile invasion, and from aggression by other Indians and white persons * * Under Article VIII the United States was required to distribute certain sums to the Indians per capita. Under Article IX it was required to remove the Seminóles in Florida to the west and to provide them with rations and subsistence during their removal and for 12 months thereafter. Under Article XXI it was required to survey and mark the boundaries of the reservations.
Under Article I of the Treaty of March 21,1866 (14 Stat. 755), with the Seminóles, the United States agreed: “* * * In return for these pledges of peace and friendship, the United States guarantee them quiet possession of their country, and protection against hostilities on the part of other tribes * * Under Article IV the United States agent was required to make a roll of those members of the tribe who had not committed acts of hostility against the Government of the United States in the War between the States so they could be compensated for losses incurred by them as a result of their cooperation with the United States Government. Under Article VII the United States under *626 *took to take a census of the tribe for the purpose of electing ■delegates to a general council of all the tribes in the Indian ■territory.
The plaintiff says that maintenance of an agency was for the purpose of fulfilling these treaty obligations. It seems to us this necessarily must be so, in part at least. No doubt this agent did for this tribe a great many things not required by treaty, but undoubtedly a considerable part of his time was devoted to fulfilling the obligations the United States had assumed in the treaties of 1856 and 1866, in consideration for which the United States reaped large benefits.
The proof shows, and indeed it is common knowledge, that white people were constantly encroaching on the Indian lands and that Indian traders were constantly imposing upon and defrauding the Indians, necessitating revocation of licenses .and careful investigations before issuing others. Protection •of the Indians against these two things was enough to keep an .agent and many employees busy all their time.
What part of their time was devoted to fulfilling treaty obligations, what part of the interpreters’ time or the miscellaneous employees’ time was consumed therein, what part of the expenses of the agency was thus incurred, the proof does not show. In the absence of such proof we can allow no part of these items as gratuities.
The item of “fuel, light, and water,” we presume, was in connection with the agency, but we do not know. At any rate, it is not shown to have been a gratuity. Nor is it shown that the “transportation of supplies” was a gratuity. This •expense may have been incurred in connection with the removal of the Florida Seminóles to the west, or it may have been for the transportation of agency supplies. What it was incurred for we are not shown.
In our former opinion we allowed these items as gratuities on the authority of Blackfeet v. United States, 81 C. Cls. 101, and Shoshone Tribe v. United States, 82 C. Cls. 23. It appears, however, that the plaintiff did not contend in the Blaokfeet case that the defendant incurred these expenses in the performance of a treaty obligation, but only that they were strictly governmental expenditures and that the tribes did not receive any benefit from the expenditures, or if *627 so, to what extent. Only this contention was considered in onr opinion. See 81 C. Cls. 137, 138. The same is true in the Shoshone case. See 82 C. Cls. 93, 94. These cases are not authority, as we had supposed, on the question raised by plaintiff in this case.
These items, or some of them, are met with in findings 11, 12, 13, 14, 15, 17, and 18 of our former opinion, and in findings 32, 33, 34, 35, 36, and 38 of this opinion. They cannot be allowed as gratuities in the absence of the necessary proof.
The defendant admitted on oral argument that agency expenses were not gratuities, although it had previously claimed that they were.
The second class of gratuities to which plaintiff raises particular objection are expenses incurred in connection with the allotment of the tribal lands to the individual Indians in severalty. Such items are found in finding 34 as follows: appraising, enrolling, general office expenses, preservation of records, probate expenses, protecting property interests, sale of townsites, surveying, surveying and allotting, traveling expenses.
These expenses, or some of them, were incurred in carrying out the Seminole Agreement ratified by the Act of July 1, 1898 (30 Stat. 567), and the Supplemental Seminole Agreement ratified by the Act of June 2,1900 (31 Stat. 250), under which tribal ownership of the lands was abolished and the lands were allotted to the Indians in severalty.
These agreements superseded the treaties of 1856 and 1866. Article IY of the former treaty provided that no portion of the land conveyed to the tribe by that treaty “shall ever be embraced or included within, or annexed to, any Territory or State, nor shall * * * ever be erected into a Territory without the full and free consent of the legislative authority of the tribe owning the same.” That same treaty in article XV provided that the “Seminóles shall be secured in the unrestricted right of self-government, and full jurisdiction over persons and property, within their respective limits;
However, by 1893 white people had crowded into this Indian Reservation in such numbers that they far outnum *628 bered the Indians, and so it became desirable, if not imperative, to abolish the tribal governments in this territory and to bring it under the dominion of the laws of the United States. In view of this situation, Congress, on March 3,1898, passed an act (27 Stat. 645) appointing a commission to enter into negotiations with the tribes—
* * * for the purpose of the extinguishment of the national or tribal title to any lands within that Territory * * * either by cession of the same or some part thereof to the United States, or by the allotment and division of the same in severalty among the Indians of such nations or tribes, * * * with a view to such and [an] adjustment * * * as may * * * be requisite and suitable to enable the ultimate creation of a State or States of the Union which shall embrace the lands within said Indian Territory.
The act directed the commissioners to undertake to secure an agreement from the Indian tribes permitting an allotment of the lands in severalty, upon the accomplishment of which they were directed to “cause the lands of any such nation or tribe or band to be surveyed, and the proper allotment to be designated.”
This commission was known as the Dawes Commission. •It entered into negotiations with the several tribes to accomplish the purposes of the Act, but found all of them quite reluctant to accede to the wishes of Congress. Such agreements, however, were finally secured after several years of dickering. That with the Seminóles was entered into in 1897 and was ratified by Congress on July 1, 1898. It provided in part: “that all lands belonging to the Seminole tribe of Indians * * * shall be divided among the members of the tribe so that each shall have an equal share thereof in value * * *. Such allotment shall be made under the direction and supervision of the commission to the Five Civilized Tribes in connection with the representative appointed by the tribal government. * * *” This agreement further provided for the exclusion from lands to be allotted of certain coal, mineral, oil, and natural gas lands, etc., for the leasing and sale thereof, and for the payment to the individual members of the tribe of the proceeds thereof, together with such other money as might be in the hands *629 of tbe United States belonging to the tribe. These payments were to be made “by a person appointed by the Secretary of the Interior.”
It is apparent, therefore, that these agreements were entered into at the behest of the defendant and as the result of much persuasion of the Indians, and that the defendant acquired substantial benefits therefrom, to wit, among others, no doubt, the incorporation into a State of the Union of the Indian lands on which many white people had settled, free from the jurisdiction and laws of the Indians, and had been guaranteed by the treaty of 1856, and subject to the exclusive jurisdiction and laws of the United States and one of its States.
In return for these benefits the United States agreed that the allotments of the lands should be done “under the direction and supervision of the commission to the Five Civilized Tribes in connection with the representative appointed by the tribal government.”
Certainly whatever expenses were incurred by the commission in directing and supervising the allotments should be borne by the defendant, because this is a duty it agreed to perform, in return for benefits received. There is no express agreement on its part to bear the expense of doing the actual work of appraising and surveying the lands and of making up rolls of citizens of the tribe entitled to an allotment and the other necessary things preliminary thereto, but we think this agreement is to be implied under all the circumstances. The Indians did not want individual allotments ; they were accustomed to and preferred tribal ownership. The Indians wanted their own tribal governments; this had been guaranteed to them in the treaty of 1856; they did not want the government of the white man. The Indians did not want to be incorporated into a State of the Union; it had been expressly promised them that they would not be. The defendant wanted all these things. The Indians acquired as a result of the agreement no land or money or other thing of advantage to which they were not already entitled.
Under such circumstances it would be highly inequitable to charge them with the expense of the metamorphosis, and *630 we have no idea they understood that they would be. They had a right to assume, we think, that when the defendant agreed that the Dawes Commission should direct and supervise the allotments it intended to agree to bear the expense of making them.
They had knowledge, no doubt, of the act of 1893 under which the commission to the Five Civilized Tribes was, created; at least they may be presumed to have known of it. They knew that that Act, in section 15, appropriated the sum of $25,000 for the survey of such lands as might be allotted by the tribes to the individual members thereof. They knew that in section 16 the commission therein created was directed to “cause the lands of any such nation or tribe or band [as should consent to the allotment of their lands to the individual Indians in severalty] to be surveyed and the proper allotment to be designated.” Thus they knew that the officers of the United States were directed to designate and survey the allotments and that the United States had appropriated some money to pay the expense of doing some of the work. What was there that could have given them the slightest intimation that the United States intended to charge them with the expense of doing so ?
It seems plain that the United States had no such intention, but, on the contrary, intended to pay the expense itself, as it should have done, since the abolition of the tribal governments and the allotments of the lands were things it wanted, not what the Indians desired or had requested.
A total of several millions of dollars was appropriated to pay the salary and expenses of the commission to the Five Civilized Tribes,[2] and there is not a suggestion in any one of the appropriation acts that the sums appropriated should be charged to the account of the Indians.
We are of the opinion the defendant intended to pay these expenses itself and that the Indians so understood when they *631 signed the Seminole Agreement ratified July 1,1898, and the Supplemental Agreement ratified June 2, 1900.
In our former opinion [93 C. Cls. 532] we allowed these expenses as gratuities on the authority of Choctaw Nation v. United States, 91 C. Cls. 320, 366, 371. However, we then overlooked the fact that the agreement under construction in that case had specifically provided that the United States should bear certain expenses incident to the breaking up of tribal ownership and that the claim there asserted by plaintiff was to recover other expenses charged to it which had not been assumed by the United States. We held that the specific assumption by the United States of a certain part of the expenses negatived an intention to assume others. In the case at bar the agreement was altogether silent as to who should bear any part of the expenses.
Although the defendant in its briefs requested the allowance as gratuities of expenses incident to allotments, it admitted on oral argument that it was not entitled to them.
There may be some doubt that some of the items in finding 34, which we have been discussing, were connected with the change from tribal to individual ownership; the indications are that all of them were; but, at any rate, the defendant has not shown that they were gratuities, and the burden is on it to do so.
In finding 17 of our former opinion (finding 38 of this opinion) appears an item of office expense, $135,219.60. The defendant admits that a part of this was incurred by the Dawes Commission in negotiating agreements with the tribes. It admits in its brief in the Supreme Court that so much of this item should not be charged as a gratuity. How much, if any, should be so charged the defendant does not show us and, hence, the entire item must be disallowed, whether or not it should be disallowed for the reason set out above.
We have set out in finding 39 expenditures made for the joint benefit of the Creek, Seminole, Cherokee, Chickasaw and Choctaw Nations, but we have not determined what part of them were made gratuitously, because the gratuities set out in the preceding findings exceed the amount the plaintiff is entitled to recover.
Except for the foregoing, our former findings and opin *632 ion with reference to the expenditures listed in findings 11, 12,13,14,15,16, 17, 18, and 19 of our former opinion, as modified by findings 32, 33,34,35 36, 37, 38, and 39 of this opinion, are adopted and reaffirmed.
It results that defendant is entitled to offset against the amount due plaintiff under this opinion the following items:
Finding 30_$31, 083. 79
Finding 31_ 175, 000. 00
Finding 32_ 7, 936. 37
Finding 33_ 5, 910. 69
Finding 34- 1, 529. 54
Findings 35, 36, and 37_ O. 00
Finding 38_ 108. 81
Total_ 221,569.20
The amount which we have found plaintiff is entitled to recover is $221,066.58. Since the amounts spent by the defendant gratuitously for plaintiff’s benefit exceed the amount plaintiff is entitled to recover, plaintiff’s petitions will be dismissed. It is so ordered.
Madden, Jfodge; Littleton, Judge/ and Booth, Chief Justice, (retired), recalled, concur.

 Acts of Mar. 3, 1893, 27 Stat. 646; Mar. 2, 1895, 28 Stat. 939 ; June 10, 1896, 29 Stat. 339; June 7, 1897, 30 Stat. 83; July 1, 1898, 30 Stat. 591; Mar. 1, 1899, 30 Stat. 939 ; May 31, 1900, 31 Stat. 236 ; Mar. 3, 1901, 31 Stat. 1073, 1074; May 27, 1902, 32 Stat. 258, 259 ; Mar. 3, 1903, 32 Stat. 994; Feb. 18, 1904, 33 Stat. 34; Apr. 21, 1904, 33 Stat. 205; Mar. 3, 1905, 33 Stat. 1060; Mar. 3, 1905, 33 Stat. 1237; Feb. 27, 1906, 34 Stat. 39 ; June 21, 1906, 34 Stat. 340 ; Dee. 19, 1906, 34 Stat. 842 ; Mar. 1, 1907, 34 Stat. 1026 ; Apr. 30, 1908, 35 Stat. 91; Mar. 3, 1909, 35 Stat. 804.