CHEROKEE NATION OF INDIANS IN OKLAHOMA ex rel. WESTERN (OLD SETTLER) CHEROKEE INDIANS et al. v. UNITED STATES.

Docket No. 2-52.

United States Court of Claims.

Jan. 13, 1953.

Paul M. Niebell, Washington, D. C., Wilfred Hearn, Chevy Chase, George E. Norvell, Tulsa, Okl., Earl Boyd Pierce, Muskogee, Okl., Houston B. Tehee, Tahlequah, Okl. and Dennis Bushyhead, Tulsa, Okl., on the briefs, for appellants.

Ralph A. Barney, Oklahoma City, Okl., James M. McInerney, Asst. Atty. Gen., for appellee.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

This is an appeal from the Indian Claims Commission. The Commission decided that the claim prosecuted before it by the appellants was without merit, and dismissed it. The claim was for compensation for 14,160,-000 acres of land which, the appellant contended, had been promised the Cherokee Indians during the negotiation of a treaty made between them and the United States in 1817, but which, by mistake, was not included in that treaty and was never thereafter transferred to them.

The evidence presented to the Commission consisted of documents and historical

records and statements. The Commission made findings of facts which quoted the pertinent documents, and rendered an opinion stating the conclusions which it drew from the evidence. A full recital of the facts by us would be largely a duplication of what has already been published by the Commission. We will, therefore, only make a statement sufficient to pose the problem and show why we think the Commission's decision was sufficiently supported by the evidence.

Originally the Cherokee Indians were in the southeastern part of the United States. One group of them, the Lower Cherokees, who lived by hunting, felt the scarcity of game in their home country and, in 1808, expressed to the President of the United States a desire to exchange their lands in the east for lands west of the Mississippi. The Government had, in 1803, acquired from France the land which became known as the Louisiana Purchase. President Jefferson advised the Cherokees to send an exploring party to look at land in Arkansas between the Arkansas and the White rivers, and, if they found an area which suited them, "the higher up (the rivers) the better", the Government would make a trade with them. They explored the Arkansas country and negotiated the treaty of 1817. No notes are extant of the discussions during the negotiation. Some ten years later a representative of the Cherokees, in a communication to the Government said that Major General Andrew Jackson, one of the Government's negotiators, had told them that they were to have a perpetual outlet to the west from their new lands in Arkansas. The Indian Claims Commission treated this statement as a self-serving declaration by the Cherokees, and apparently gave no weight to it. We think that statements made later by Government officials indicate that some such assurance was probably given during the negotiations. The treaty as signed, 7 Stat. 156, said nothing about an outlet to the west. It gave the Cherokees a tract of land in Arkansas bounded on the south by the Arkansas river, on the east by a stated line, and on the north by the White river. It left the western boundary to be later determined, when it was learned how much land the Cherokees would vacate in their eastern home land.

In February 1818, President Monroe told a delegation of Cherokee Chiefs that he had not yet obtained the lands up the Arkansas to the west of their settlement from the other Indians who occupied it, but would do so shortly. He said:

"It is my wish that you should have no limits to the west so that you may have good mill seats, plenty of game, and not be surrounded by the white people."

Communications of the Secretary of War in 1818, 1821, and 1823 show that the Government understood that the Cherokees were to have lands, or at least rights of passage through lands, west of the lands in Arkansas which they obtained outright under the treaty of 1817. The 1821 communication referred particularly to a large tract known as "Lovely's purchase" which lay immediately west of the Cherokee's Arkansas lands.

White men encroached upon the Cherokee's Arkansas lands and in 1828 a treaty was made with them, 7 Stat. 311, whereby they exchanged all their lands in Arkansas for a tract of 7,000,000 acres west of the western boundary of Arkansas. That treaty said that, pursuant to the pledges of the President of the United States and the Secretary of War in regard to the outlet to the west:

"The United States further guarantee to the Cherokee Nation a perpetual outlet, West, and a free and unmolested use of all the Country lying west of the Western boundary of the above described limits, and as far West as the sovereignty of the United States, and their right of soil extend."

The 1828 treaty left the western line of the 7,000,000-acre tract to be determined by a future survey, and to be so run as to enclose that number of acres. In 1833 the parties made an agreement fixing that line, and repeating the language of the 1828 treaty, above quoted, about the land to the west of the 7,000,000 acres. 7 Stat. 414. In a treaty made in 1835 and proclaimed in 1836 the Government, in consideration

of the cession of all Cherokee lands east of the Mississippi, paid the Cherokees 5 million dollars and sold them 800,000 acres adjoining their 7,000,000 acres for $500,000. 7 Stat. 478. This treaty again repeated the language quoted above.

On December 31, 1838, a patent was issued by the United States to the Cherokee Nation for certain described lands containing 14,374,135 acres. These lands were the 7,000,000 acres, the 800,000 acres, and the lands to the west to the line dividing the United States from Mexico, which additional lands, the patent says, constitute the promised outlet. The dividing line between the United States and Mexico was, at that time, the 100th meridian west, which is the western line of the main part of Oklahoma and the eastern line of the northern panhandle of Texas.

In 1868 a treaty was negotiated with the Cherokees under which they would have been paid $3,500,000 for their lands west of the 96th meridian and for their relinquishment of all their right and interest "in and to that portion of the Cherokee 'outlet' embraced within the panhandle of Texas, containing about 3,000,000 acres, and that portion within New Mexico and Colorado." That treaty was submitted by the President to the Senate but was not ratified. (Confidential Exec. Doc. 3 P, 40th Cong., 2d Sess., p. 5.) Under an agreement with the Cherokees ratified by an Act of Congress of March 3, 1893, 27 Stat. 612, 640, the Cherokees sold to the United States for $10,423,262.99, their lands between the 96th and the 100th meridians, consisting of 8,144,682.81 acres.

The land for which compensation was sought before the Indian Claims Commission in the instant case is the strip lying between the 36th and 37th degrees of latitude, and extending from the 100th degree of longitude west to the Rio Grande river in New Mexico. As we have said, it comprises 14,160,000 acres.

· The vague assurances given by President Monroe, and the Secretary of War to the Cherokees, and probably given by General Jackson when the treaty of 1817 was under negotiation, might be given any one of several meanings. The most extreme interpretation would be that whatever lands the United States then owned or might later acquire, lying west of the Cherokees' new lands in Arkansas, would become theirs in fee simple. Under that interpretation their present claim would extend to the Pacific Coast. But the promise would still have been indefinite in several respects. If it meant that lines were to be drawn straight west from the northwest and southwest corners of the Cherokees' Arkansas lands, and the outlet was to be the land between those lines, it will be remembered that these corners were not fixed by the treaty of 1817, but were to be set at a later time, depending upon how much land the Cherokees vacated east of the Mississippi. The more land they so vacated, the farther up the Arkansas and White rivers the corners would be set, and the wider the outlet strip would be. The Cherokees do not assert and never have asserted, such an extreme interpretation of the assurances.

Another interpretation would be that the Cherokees would have the lands to the west, so far as they were then owned by the United States. That would have still left the width of the strip, and the location of its north and south boundaries, completely undefined, with possible large variations in the acreage. The further question whether the "outlet" was to be owned outright, or the Cherokees were to have only hunting rights in it, or rights of passage through it to the then open country to the west, would have been posed. If outright ownership had been contemplated, one wonders why the parties would have provided for the surveying and fixing of a western line to the Cherokees' Arkansas lands, since they were to own the lands west of the line in the same way that they owned the lands east of it. And this interpretation would also pose the question of what lands the United States owned in 1817, when the treaty relied on by the appellants was made.

The United States had acquired the Louisiana Purchase from France in 1803. Spain owned the land to the west of the purchased land. France and Spain, and after the purchase, the United States and Spain were in a dispute as to the boundary,

we claiming that it was the Rio Grande river and Spain claiming it was the 100th meridian. President Jefferson in 1805 sent James Monroe to Spain to negotiate a settlement. He did not succeed, and, in 1817, after he became President, and only a few months before he gave the assurances to the Cherokee Chiefs, referred to above, he reported to Congress that the question was still unsettled. The claims of both parties may have been extreme. The line was fixed in the treaty of February 22, 1819, between the United States and Spain, in which Spain ceded Florida to the United States and the western boundary was fixed at the 100th meridian. 8 Stat. 252. The history of the transaction is significant in that it indicates that President Monroe, in view of his intimate acquaintance with the problem, would not have been likely to promise lands in the disputed area to the Cherokees, those lands being, of course, some hundreds of miles west of the lands where the Cherokees were settled. The assurances given by the Secretary of War were, in most instances, given after the treaty with Spain when we were no longer even claiming the lands west of the 100th meridian. Yet there is no intimation that either the officers of the United States, or the Cherokee Chiefs who had extremely intelligent leadership, thought that the relinquishment by the United States of its claim to the lands west of the 100th meridian had any relation to the problem of the Cherokee outlet. None of them were thinking of lands hundreds of miles to the west.

The assurances of an outlet, then, given in connection with and after the treaty of 1817, were, as both parties knew, vague, indefinite and incapable of administration without further negotiation and agreement. The Cherokees were entitled to have those further negotiations carried on in keeping with the spirit of the vague assurances which they had been given. They were so carried on. The treaty of 1828 recognized in the most explicit terms that the Cherokees were entitled to more than the lands which had been surveyed and definitely bounded for them; the question whether the "outlet" meant absolute ownership or mere-

ly a right of passage or use was resolved in their favor by the issuance, in 1838, of an outright patent to them of the lands all the way to the 100th meridian.

We conclude that whatever obligation can be spelled out of the rather expansive language used by Governmental officials during and after the negotiation of the treaty of 1817 was fulfilled fairly and in good faith by the Government's subsequent conduct in regard to the Cherokee Indians.

The decision of the Indian Claims Commission is affirmed.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER, and LITTLETON, Judges, concur.