CHEROKEE NATION OF INDIANS IN OKLAHOMA for and on Behalf of WEST- ERN (OLD SETTLER) CHEROKEE IN- DIANS v. UNITED STATES.

Appeals Docket No. 3-52.

United States Court of Claims.

Feb. 3, 1953.

Paul M. Niebell, Washington, D. C., for the appellants. Wilfred Hearn, Chevy Chase, Md., George E. Norvell, Tulsa, Okl., Earl Boyd Pierce, Muskogee, Okl., Houston B. Tehee, Tahlequah, Okl. and Dennis Bushyhead, Tulsa, Okl., were on the briefs.

Ralph A. Barney, Oklahoma City, Okl., with whom was Asst. Atty. Gen. James M. McInerney, for the appellee.

Before JONES, Chief Judge, and LIT- TLETON, WHITAKER, MADDEN and HOWELL, Judges.

MADDEN, Judge.

This is an appeal from a decision of the Indian Claims Commission, which in its Docket No. 24 dismissed the petition of the appellants. The action before the Commis- sion was brought by the Cherokee Nation, in behalf of the Western Cherokee Indians, for the true value of two-thirds of a tract of 13,574,135.14 acres of land in the Indian Territory which, the appellants alleged, was owned exclusively by the Western Chero- kees, but which was taken from them by the United States in 1838 when it settled the Eastern Cherokees upon that part of the land.

By an agreement of the parties, ap- proved by the Indian Claims Commission, the proceeding before the Commission was limited, in the first instance, to the question whether the Western Cherokees were the exclusive owners of the land on which the Eastern Cherokees were settled. If not, the case was to be dismissed, since there would be no point in taking evidence as to the value of the land. If it had been de- termined by the Commission that the West- ern Cherokees were the exclusive owners of the land, the case would have proceeded to trial upon the question of the value of the land.

The Commission made findings of fact and rendered an opinion determining that the Western Cherokees were not the exclusive owners of the land in question. It therefore dismissed the petition, and the present appeal was filed. Our question, then, is whether the Commission's conclusion that the Western Cherokees were not the exclusive owners of the land is adequately supported. For the answer, we turn to pertinent history, treaties, and other documents, which we will treat briefly.

The Cherokee Indians were originally in the east, in Western North Carolina, Eastern Tennessee and Northern Georgia. The so-called Lower Cherokees lived principally by hunting and the Upper Cherokees by agriculture. In 1808 delegates from the two groups visited President Jefferson and each group expressed its desires to him. The Lower Cherokees desired to move west of the Mississippi where they would not be encroached upon by the whites. The Upper Cherokees desired to stay on their lands in the east. The President suggested that the Lower Cherokees send an exploring party to Arkansas to see if they could find an area of land between the Arkansas and the White Rivers which they would be willing to take in exchange for their lands in the east, the amount of land that they would get in Arkansas to be in proportion to the number of Cherokees who would emigrate to that country.

The Lower Cherokees explored the Arkansas country and expressed their desire to make the exchange. The Treaty of July 8, 1817, 7 Stat. 156, resulted. The treaty provided for the exchange of lands, and for the proportionate division of existing annuities between the Cherokees who remained in the east and those who went west. About six thousand went west at this time, and more than twice that number remained in the east. Those who went west set up their own government. In 1819 the United States made a treaty with the Eastern Cherokees which assured them that the lands already conveyed by the Cherokee Nation to the United States in exchange for the lands in the west were in full satisfaction of all claims of the United States against the Cherokees in that regard. Treaty of February 27, 1819, 7 Stat. 195.

White men began to settle in Arkansas, and the Cherokees there desired to go farther west. The Treaty of May 6, 1828, 7 Stat. 311, was made, between the "Chiefs and Head Men of the Cherokee Nation of Indians, West of the Mississippi," and the United States. By this treaty the United States granted what turned out to be more than 13,000,000 acres of land in the Indian Territory in exchange for the Cherokees' 3,285,710 acres in Arkansas. The treaty said in part:

"Whereas, it being the anxious desire of the Government of the United States to secure to the Cherokee nation of Indians, as well those now living within the limits of the Territory of Arkansas, as those of their friends and brothers who reside in States East of the Mississippi, and who may wish to join their brothers of the West, *a permanent* home, * * *.

"Art. 2. The United States agree to possess the Cherokees, and to guarantee it to them forever, and that guarantee is hereby solemnly pledged, of seven millions of acres of land, to be bounded as follows, viz: * * *. In addition * * *, the United States further guarantee to the Cherokee Nation a perpetual outlet, West, and a free and unmolested use of all the Country lying West of the Western boundary of the above described limits, and as far West as the sovereignty of the United States, and their right of soil extend."

This language and the extent of the area granted seem to make it plain that provision was being made for all the Cherokees, including those in the east, or as many of them as might later come to the lands granted. There is nothing in the treaty or in the history of the times to indicate that when they did come they were to have only limited political or property rights in the western territory. The use of the words "the Cherokees" rather than "the Western Cherokees" in Article 2 and elsewhere in

the treaty is urged by the Government as evidence that the grant was to the Cherokee Nation as a whole. The words, in their context, are ambiguous, but it seems to us that, in view of the statement in the preamble, the Government would not have been willing to make the grant to the "Western Cherokees" without an explanation that all those who might later come west were to be "Western Cherokees" for the purpose of sharing in the benefits of the grant.

In Article 8 of the treaty it was said that the Cherokees were receiving "a. large extent of unembarrassed country; and that their Brothers yet remaining in the States may be induced to join them and enjoy the repose and blessings of such a State in the future," the United States agreed to pay the expenses of removal and maintenance of Eastern Cherokees who might come west. On December 23, 1831, three years after the making of the treaty, John Jolly, the Chief of the Western Cherokees, wrote to the Chiefs in the east an urgent invitation to the Eastern Cherokees to come west. He said:

"The country secured by the Treaty of 1828 is considered the joint property of the Cherokees both east and west; and the first wish of my heart is to see all the Cherokees united as one people."

By the Treaty of December 29, 1835, 7 Stat. 478, the Cherokees purported to cede to the United States all their lands east of the Mississippi River, for $5,000,000 and to remove to the lands in Indian Territory within two years. This treaty was made by unauthorized persons and was repudiated by the responsible officials of the Eastern Cherokees. The faction of the Eastern Cherokees which had made the treaty, the so-called Ridge or Treaty Party, consisting of some two thousand persons, migrated west and were taken in by the Western Cherokees under their government and laws. The rest of the Eastern Cherokees were forcibly removed to the Cherokee lands in the Indian Territory. See Western Cherokee Indians v. United States, 27 Ct.Cl. 1, 2–3, 20–35. Upon their arrival there, they, being in the majority, refused to submit to the established government of the Western Cherokees, and set up their own laws and government. They persecuted the Treaty Party Cherokees and the Western Cherokees and a period of sanguinary strife, bordering on civil war, ensued. The Western Cherokees seem to have conducted themselves with great restraint during this tragic period. Finally, in June 1846, the Western Cherokees offered to submit their claims to exclusive ownership of the western lands and their other grievances to a board of commissioners, to be appointed by the President and Senate of the United States, which commission should have full power to settle the matters in controversy. The proposal was accepted by all factions of the Cherokees, the commission was set up and, on July 30, 1846, made its report to the President. The commission decided, with regard to the claim of the Western Cherokees to the exclusive title to the lands granted by the Treaty of 1828, that the claim was not valid. The commission found that the land:

"was intended for the use of and to be a home for, the whole Cherokee Nation, including that portion east, as that portion west of the Mississippi river."

This decision, made while many of the participants in the Treaty of 1828 were still available, is, of course, of great persuasive force as to what was intended by that treaty. As to whether it was, as an arbitration, conclusive upon the Western Cherokees, we need not decide. They requested the arbitration and agreed to be bound by it. Their distressful plight put them under a good deal of pressure to get their grievances disposed of in any way that might promise relief from strife. But the correctness of the decision of the commissioners depended upon the meaning of the Treaty of 1828, and the Western Cherokees were under no duress when they made that treaty. They were then looking forward hopefully to the reunion of their Nation. They were later disappointed and harassed by the conduct of the Eastern Cherokees who were forced to migrate to the west.

That was a tragic grievance to them, but it did not affect the ownership of the land, which was determined by the earlier treaty.

The Treaty of August 6, 1846, 9 Stat. 871, entered into only a few days after the decision of the commission appointed by the President, merely embodied the commission's decision, so far as the ownership of the lands was concerned.

Our review persuades us that the decision of the Indian Claims Commission was right, and we affirm it.

It is so ordered.

JONES, Chief Judge, and HOWELL, WHITAKER and LITTLETON, Judges, concur.