The UNITED STATES of America

v.

The CHEROKEE NATION.

No. 173-A.

United States Court of Claims.

Feb. 16, 1973.

Paul M. Niebell, Washington, D. C., attorney of record, for appellee. Earl Boyd Pierce, Ft. Gibson, Okl. and George E. Norvell, Washington, D. C., of counsel.

Ralph A. Barney, Washington, D. C., with whom was Asst. Atty. Gen. Kent Frizzell, for appellant.

Before COWEN, Chief Judge, DURFEE, Senior Judge and DAVIS, SKELTON, NICHOLS, KUNZIG, and BENNETT, Judges.

COWEN, Chief Judge.

In this proceeding the Government appeals from two decisions of the Indian Claims Commission in its Docket No. 173–A. One issue before the court concerns the proper valuation date for 2,121,928.74 acres of land owned in fee simple by the Cherokee Nation and ceded to the United States for the use of other Indian tribes pursuant to the terms of a treaty concluded in 1866. The Commission concluded that all the land should be valued, for the purpose of determining its then fair market value, as of June 14, 1883, the date on which the Cherokee Nation deeded the land to the United States.[1] The appellant asserts that the land should properly be valued as of several earlier dates when the Cherokee Nation was deprived of the effective occupancy and use of the land. The second

---

1. Cherokee Nation v. United States, 22 Ind.Cl.Comm. 417 (1970); Interlocutory Order of February 4, 1970, *id.* at 437.

issue involves an offset which the appellant desires to apply against the amount of the award determined by the Commission as additional compensation to the appellee on account of the cession of the 2,121,928.74 acres. A partial payment for the land in question was credited to the Cherokee Nation on the books of the Treasury in 1873; by June 14, 1883, the date of the execution of the deeds, a substantial amount of interest had accumulated on the principal amount of the payment. The Commission found that such interest was neither an additional payment for the land, nor a gratuity, and denied the claimed offset.[2] The appellant contends that the denial of the claimed offset was error. For reasons to be detailed below, we affirm the Commission's decision with respect to the valuation date, but we have concluded that the Government is entitled to credit for the claimed offset as a matter of law. Because in our view the resolution of the valuation date issue directly controls the disposition of the offset issue, the valuation date will be discussed first.

Pursuant to treaties concluded in 1828, 1833, and 1835, between the Cherokee Nation and the United States, the Cherokees exchanged their lands in Arkansas for a large tract of land in the Indian Territory (now the State of Oklahoma).[3] The Cherokees received fee simple title to their new lands under a United States patent issued in 1838; the lands consisted of an eastern segment (known as the Cherokee homeland), and to the west thereof the tract known as the Cherokee Outlet.[4] The Cherokee Outlet comprised a total of 8,144,682.91 acres located in what is now the northern part of Oklahoma between the 96th and 100th meridians.[5] During the Civil War the Cherokees formed an alliance with the Confederate States of America. Following the war, the Cherokee Nation entered into a new treaty with the United States, concluded on July 19, 1866,[6] by which the alliance with the Confederacy was declared void, amnesty was granted to the Cherokees, and their title to the lands west of the Mississippi River was reconfirmed. However, under Article XVI of the Treaty of July 19, 1866, the Cherokees agreed to allow the United States to settle other tribes of friendly Indians on reservations to be set aside on the Cherokee Outlet, but the Cherokees were to receive compensation for the tracts taken for the use of the other tribes. Article XVI declared this arrangement in the following terms:

Article XVI. The United States may settle friendly Indians in any part of the Cherokee country west of 96°, to be taken in a compact form in quantity not exceeding one hundred and sixty acres for each member of each of

---

2. Cherokee Nation v. United States, 27 Ind.Cl.Comm. 23 (1972).

3. The detailed history of the Cherokee Nation and its removal west of the Mississippi River is set forth in Cherokee Nation v. United States, 2 Ind.Cl.Comm. 7 (1952), aff'd, 109 F.Supp. 238, 124 Ct. Cl. 127 (1953); and in Cherokee Nation v. United States, 2 Ind.Cl.Comm. 37 (1952), aff'd, 109 F.Supp. 532, 124 Ct.Cl. 315 (1953).

4. See Cherokee Nation v. United States, 9 Ind.Cl.Comm. 162, 163, 199–200 (1961).

5. Id. at 165–166. In that proceeding (Commission Docket No. 173), the Cherokee Nation argued that the United States had compelled it, by force and duress, to cede to the United States the entire 8,-144,682.91 acres of Outlet land, under the

terms of an agreement concluded in 1891, for compensation grossly below the then fair market value of that tract. The Commission concluded that under the 1891 agreement, the Cherokees ceded to the Government all the Outlet land then owned by them, 6,022,754.17 acres. The Commission determined the value of that acreage as of March 3, 1893, the date Congress ratified the 1891 agreement. However, the Commission ruled that the Cherokees had lost title to the remaining 2,121,928.74 acres at some time prior to 1891. 9 Ind.Cl.Comm. at 220. The claims of the Cherokees with respect to the latter acreage were severed from Docket No. 173, and redesignated as Docket No. 173–A, which became the subject of the instant case. 22 Ind.Cl.Comm. at 417.

6. 14 Stat. 799.

said tribes thus to be settled; the boundaries of each of said districts to be distinctly marked, and the land conveyed in fee simple to each of said tribes to be held in common or by their members in severalty as the United States may decide.

Said lands thus disposed of to be paid for to the Cherokee nation at such price as may be agreed on between the said parties in interest, subject to the approval of the President; and if they should not agree, then the price to be fixed by the President.

The Cherokee nation to retain the right of possession of and jurisdiction over all of said country west of 96° of longitude until thus sold and occupied, after which their jurisdiction and right of possession to terminate forever as to each of said districts thus sold and occupied. (14 Stat. 799, 804.)

Pursuant to the terms of the 1866 treaty and Article XVI thereof, the United States caused other tribal groups of Indians to settle on reservations located on the Cherokee Outlet. As each of the resettled tribes occupied its new reservation, Congress enacted legislation confirming the establishment of those reservations. The enactments and acreage allotted to the several tribes are listed in the following table.

| Date and Citation | Tribal Group | Acreage |
|---|---|---|
| June 5, 1872; 17 Stat. 228 .............. | Osage & Kaw ........... | 1,570,196.30 |
| April 10, 1876; 19 Stat. 28, 29 ........... | Pawnee ................ | 230,014.04 |
| May 27, 1878; 20 Stat. 63, 76 ........... | Ponca ................ | 101,894.31 |
| May 27, 1878; 20 Stat. 63, 74 ........... | Nez Perce .............. | 90,710.89 |
| March 3, 1881; 21 Stat. 380, 381 ......... | Otoe & Missouria ........ | 129,113.20 |
| Total .............................. | ....................... | 2,121,928.74 |

(22 Ind.Cl.Comm. at 420, 429; 9 Ind.Cl.Comm. at 164–165.)

The parties to the 1866 treaty were, however, unable to agree on appropriate compensation for the reservation tracts; therefore, the consideration payable to the Cherokees for each tract was ultimately determined by the President.[7] Subsequently, the Cherokees protested that the compensation stipulated by the President was not reasonably representative of the fair market value of their land. Consequently, the Cherokees refused to execute deeds for the reservation tracts at the times when the other tribes entered onto their reservations, and the compensation therefor was fixed by the President. Presumably for the purpose

7. The compensation determined by the President for each tract is listed in the following table:

| Tribe | Acreage | Total Compensation | Price Per Acre |
|---|---|---|---|
| Osage & Kaw ........................ | 1,570,196.30 | $1,099,137.41 | $.70 |
| Ponca ............................. | 101,894.31 | 48,389.46 | .4749 |
| Pawnee ........................... | 230,014.04 | 161,009.82 | .70 |
| Nez Perce ......................... | 90,710.89 | 43,078.60 | .4749 |
| Otoe & Missouria ................... | 129,113.20 | 61,315.85 | .4749 |

(22 Ind.Cl.Comm. at 429.)

of resolving the dispute, Congress, by the Act of March 3, 1883,[8] appropriated an additional $300,000 to compensate the Cherokees for the reservation tracts, but also provided that this sum would not be paid until proper deeds had been executed by the Cherokees transferring title to the reservations to the United States for the use of the resettled tribes. It does not appear that the Cherokees were greatly satisfied by this arrangement, but on June 14, 1883, the Cherokee Nation duly executed the requisite deeds, albeit under protest. During the next decade, certain additional compensation was granted to the Cherokees for the said reservation tracts, and by 1893 the Cherokees had received a total of $2,627,411 as compensation for the 2,121,928.74 acres of Cherokee Outlet land set aside as reservations for other Indian tribes.[9]

The Cherokee Nation initiated the instant proceeding before the Indian Claims Commission (Docket No. 173–A of the Commission) to recover just compensation from the United States, under the Fifth Amendment, for the taking of the 2,121,928.74 acres of the Cherokee Outlet as described above. The Commission ruled that the elements of a Fifth Amendment taking cause of action were lacking, and declared that the proceeding could be maintained only on the theory that the consideration paid to to the Cherokees for the reservation tracts ceded to the United States under the terms of the Treaty of July 19, 1866, was "unconscionable consideration" within the meaning of clause 3 of section 2 of the Indian Claims Commission Act of 1946.[10] In order to determine whether or not the compensation paid to the Cherokees for said reservation land was "unconscionable consideration,"[11] it was necessary for the Commission to determine the fair market value of the several reservation tracts at the time the

---

8. 22 Stat. 603, 624. The Act, in pertinent part, provided as follows:

"That the sum of three hundred thousand dollars is hereby appropriated, to be paid into the treasury of the Cherokee Nation, out of the funds due under appraisement for Cherokee lands west of the Arkansas River, which sum shall be expended as the acts of the Cherokee legislature direct, this amount to be immediately available: *Provided*, That the Cherokee Nation, through its proper authorities, shall execute conveyances, satisfactory to the Secretary of the Interior, to the United States in trust only for the benefit of the Pawnees, Poncas, Nez Perces, Otoes and Missourias, and Osages now occupying said tract, as they respectively occupy the same before the payment of said sum of money."

9. In its finding No. 9 (22 Ind.Cl.Comm. at 430), the Commission found that this total of compensation consisted of the following amounts:

"9. The total consideration was made up of the $48,389.46 paid for the Ponca reservation and the $1,099,137.41 paid for the Osage reservation; plus $300,000.00 credited to the plaintiff under the Act of June 16, 1880 (21 Stat. 238, 248); plus the other $300,000.00 which was paid over to the plaintiff when it transferred its interest in the reservation lands by deeds in 1883; plus $80,000.00 paid in 1888 and 1889; plus $799,884.13 which this Commission determined was a proportionate share for the reservation lands of the consideration paid pursuant to an Act of March 3, 1893 (27 Stat. 612, 640). Cherokee Nation v. United States, 9 Ind. Cl.Comm. 162 (1961), at 232, 233. The aggregate of $165,404.27 owed for the other three reservations was included in the $300,000.00 credited to the plaintiff in 1880.

"The total amount of consideration detailed in the paragraph immediately preceding comes to $2,627,411.00. * * *"

10. 25 U.S.C. § 70a, which reads, in pertinent part, as follows:

"The Commission shall hear and determine the following claims against the United States on behalf of any Indian tribe, band, or other identifiable group of American Indians residing within the territorial limits of the United States or Alaska: * * * (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of * * * unconscionable consideration * * *."

11. *See* Miami Tribe of Oklahoma v. United States, 281 F.2d 202, 208, 150 Ct.Cl. 725, 736 (1960), cert. denied, 366 U.S. 924, 81 S.Ct. 1350, 6 L.Ed.2d 383 (1961).

rights of the Cherokee Nation therein terminated. The Commission concluded that the fair market value of the entire 2,121,928.74 acres should be determined as of June 14, 1883, the single date on which the Cherokee Nation executed deeds conveying each of the reservation districts to the United States for the use of the several tribes. In support of this conclusion as to the proper valuation date, the Commission stated:

> * * * The third paragraph of Article XVI of the 1866 treaty provided for the plaintiff to retain ownership of (there expressed as "right of possession of and jurisdiction over") the Cherokee Outlet lands used for relocating tribes of friendly Indians *"until thus sold and occupied."* Clearly, the treaty contemplated actual sale as a chief element of termination of the plaintiff's title. And in the United States, termination of the owner's title to real estate by sale is accomplished by execution of a deed. * * There were deeds in this instance. From the language of the treaty, cited above, this Commission concludes that disposition of this case requires determination of the fair market value of all of the two-million-plus acres as of the date of the deeds: June 14, 1883. (22 Ind.Cl.Comm. at 423; emphasis in original; citation omitted.) [12]

It is the Government's contention that the determination of the Commission as to the valuation date for the several reservation tracts on the Cherokee Outlet was erroneous. In the appellant's view, the Cherokee Nation was deprived of "the right of possession of and jurisdiction over" those tracts, within the meaning of the third paragraph of Article XVI of the 1866 treaty, as of the several dates on which Congress confirmed the establishment of the various reservations.[13] The Government views as irrelevant the date when formal title to the reservations passed to the United States upon the execution of deeds, arguing that the lands were "sold and occupied" as contemplated in the treaty when the Cherokees lost their rights of occupancy and use of each tract. Appellant asserts that in such cases as Three Affiliated Tribes of the Fort Berthold Reservation v. United States, 390 F.2d 686, 182 Ct.Cl. 543 (1968); Kickapoo Tribe of Kansas v. United States, 372 F.2d 980, 178 Ct.Cl. 527 (1967); and Northern Paiute Nation v. United States, 27 Ind.Cl.Comm. 39 (1972), this court and the Commission have consistently refused to be bound by "technical questions of passage of title" [14] in determining when the interests of various parties in Indian lands have accrued or terminated. Instead, appellant says that the court and the Commission have looked to other, more practical considerations in making such determinations. The Government also argues that the Cherokee Nation was obligated by Article XVI of the Treaty of July 19, 1866, to transfer formal title to the reservation districts as soon as the reservations were

---

12. Having so determined the date of valuation, the Commission, after weighing conflicting expert testimony by both parties as to the 1883 value of the reservation tracts, concluded that the then fair market value of the land was $6,896,000, and held:

    " * * * [D]efendant paid the plaintiff a total of $2,627,411.00 for the 2,121,928.74 acres of the Cherokee Outlet on which were settled tribes of friendly Indians. The fair market value of those two-million-plus acres on June 14, 1883, was $6,896,000.00, or $3.25 per acre. The disparity between the consideration and the actual fair market value was so gross as to amount to unconscionable consideration within the contemplation of Clause 3 of Section 2 of the Indian Claims Commission Act of 1946. Accordingly, the plaintiff may have of and from the defendant the entire difference, that is, $4,268,589.00, less allowable counterclaims and offsets." (22 Ind.Cl.Comm. at 425.)

13. *I. e.* June 5, 1872 for the Osage and Kaw reservation; April 19, 1876 for the Pawnee tract; May 27, 1878, for the Ponca and Nez Perce reservations; and March 3, 1881, for the Otoe and Missouria reservation.

14. 182 Ct.Cl. at 565, 390 F.2d at 698.

established by the United States and occupied by the several tribes, and the compensation for the lands was determined by the President. The Government maintains that the Cherokees breached this obligation by delaying execution of the deeds, without justification until required to execute them by the Congressional Act of March 3, 1883. Therefore, the Government reasons, the Cherokees should not be granted a profit for their wrongdoing and receive the benefit of an increase in general land prices,[15] through the Commission's extension of the valuation date until the time the deeds were executed—June 14, 1883. For the latter proposition the appellant cites Kickapoo Tribe v. United States, *supra*.

■■ However, we affirm the Commission's conclusion that June 14, 1883, is the proper date for valuation of the subject lands, because we believe that the Commission correctly focused on the significant fact that the Cherokees held title to the Cherokee Outlet in fee simple under patents issued by the United States.[16] This factor distinguishes the instant case from others which involved Indian tribes whose rights in land were of a lesser estate than fee simple title. For example, many cases have dealt with so-called Indian "occupancy title" or "aboriginal title",[17] by which the rights of a tribe in a given tract of land have depended entirely on the exclusive occupancy and use of the area by the tribe. In such situations the fee is considered to be held by the United States. Ab-

original title has been found to have been extinguished whenever a tribe has lost the exclusive dominion over its land.[18] In other cases, Indian title to land has been characterized as "recognized title", where the United States accorded formal recognition to the rights and interests of a tribe in land by treaty or by statute.[19] The acts constituting recognition may have given the Indians fee simple title or something less than fee simple title.[20] Therefore, where recognized title has been involved in cases dealing with interests in Indian lands, the court has examined the nature of the title to determine what acts are sufficient to terminate the interests of an Indian tribe in the land. Three Affiliated Tribes of Fort Berthold Reservation v. United States, *supra*, relied on by appellant, is illustrative of cases dealing with a form of recognized title not amounting to fee simple title. In that case, the Indians held their land under "reservation title", but the fee had been retained by the United States. 390 F.2d at 689, 182 Ct. Cl. at 549. Eventually some of the unallotted reservation land was sold to homesteaders. The Indian claimants argued that the compensation received by them for the land was far below the fair market value thereof at the time of the sales and contended that the proper valuation dates of the numerous tracts were the dates on which formal patents were issued to the homesteaders. The court rejected that argument, holding that the tracts should be valued as of the times when the homesteaders entered on-

---

15. The Commission found that the value of land comparable to that in question more than doubled between 1873 and 1883. 22 Ind.Cl.Comm. at 424.

16. Issuance of a Government patent granting title to land is "the most accredited type of conveyance known to our law." United States v. Creek Nation, 295 U.S. 103, 111, 55 S.Ct. 681, 685, 79 L.Ed. 1331 (1935).

17. *See* Simon Plamondon v. United States, 467 F.2d 935, 199 Ct.Cl. —— (1972), and cases cited therein; and Miami Tribe of Oklahoma v. United States, 175 F.Supp. 926, 146 Ct.Cl. 421 (1959).

18. Simon Plamondon, *supra*, 467 F.2d at 937, 199 Ct.Cl. at ——; Miami Tribe of Oklahoma, *supra*, 175 F.Supp. at 936, 146 Ct.Cl. at 439.

19. Miami Tribe of Oklahoma v. United States, *supra*, 445–446, 175 F.Supp. at 936, 940, 146 Ct.Cl. at 439. Recognized title is also commonly referred to as "treaty title", "acknowledged title", or "reservation title. *Id.*

20. 175 F.Supp. at 940, 146 Ct.Cl. at 445–446.

to their tracts and took possession of them. The court reasoned that such entry gave the homesteaders preemptive rights against anyone except the United States and effectively deprived the Indians of their entire interest in the land. The court did not consider relevant the fact that the United States did not part with its purely formal legal title until somewhat later, because it was the termination of the rights of the Indian claimants that was at issue. 390 F.2d at 698, 182 Ct.Cl. at 565–566. It is readily apparent that the decision in the *Fort Berthold* case is distinguishable from the present situation, wherein the Cherokees had fee simple title to the Cherokee Outlet lands when they entered into the Treaty of July 19, 1866.[21] Consequently, the rationale of the *Fort Berthold* case does not support the appellant's position in this case.

When all the provisions of Article XVI of the 1866 treaty are read in harmony, it is clear that formal conveyance of the Cherokee Nation's fee simple interest in the reservation tracts to the other tribes was an essential element of the transactions contemplated in the treaty. The first paragraph of Article XVI, which gave to the United States the right to settle friendly Indian tribes on the Cherokee Outlet, further provided that the land set aside for the other tribes was to be "conveyed in fee simple to each of said tribes * * *." The second paragraph set forth the methods by which the consideration payable to the Cherokees for the tracts was to be determined. The final paragraph provided that the Cherokee Nation would "retain the right of possession of and jurisdiction over all of said country" until the land was *thus sold* and occupied." (Emphasis added.) The Cherokee Nation's "jurisdiction and right of possession" was to "terminate forever" when each of the reservation districts was *thus sold* and occupied." (Emphasis added.) Reasonably con-

strued, Article XVI of the Treaty of July 19, 1866, contemplated termination of Cherokee rights in the reservation tracts only upon the completion of all of the formal elements of the sale transaction: the establishment and occupancy of the several reservation districts, the determination of the consideration payable to the Cherokee Nation therefor, and conveyance of the fee simple title held by the Cherokee Nation therein. Since all of these preconditions were not satisfied until June 14, 1883, the Commission correctly looked to that date as the proper valuation date for all the reservation tracts set aside for the use of the other tribes.

It has long been the rule in taking cases involving Indian lands to which the claimant tribe held fee simple title, that for purposes of determining just compensation, the date of taking is not the time when the Indians were deprived of physical possession and use of their land, but is rather the time when that land was formally conveyed to other parties. Creek Nation v. United States, 302 U.S. 620, 622, 58 S.Ct. 384, 82 L.Ed. 482 (1938); Seminole Nation v. United States, 102 Ct.Cl. 565, 620 (1944), cert. denied, 326 U.S. 719, 66 S.Ct. 24, 90 L. Ed. 426 (1945). In the *Creek Nation* case, lands held by the Creeks in fee simple were, due to an erroneous survey in 1872, inadvertently set aside by the United States for the use of other tribes. In 1891, before the boundary error was discovered, Congress provided that all of the subject land that had not been allotted to individual Indians in severalty would be sold to homesteaders; numerous tracts were patented to settlers at various times between 1893 and 1909. It was held that neither congressional approval of the erroneous survey in 1873, nor the congressional determination to sell the land to homesteaders in 1891, were acts sufficient to constitute the taking complained of by the Creeks.

---

21. The Government does not contend that the Cherokees did not possess fee simple title to the Cherokee Outlet at the time of the 1866 treaty. That issue was settled in two prior proceedings before the Commission. 9 Ind.Cl.Comm. at 210–217; 2 Ind.Cl.Comm. at 36.

It was rather "the consequent disposals of the lands to adverse holders [that] constituted the taking by the United States." 302 U.S. at 622, 58 S.Ct. at 385. The Creeks were held entitled to the present full value of the land as of the dates patents were issued to homesteaders for the several tracts. The facts of the *Seminole Nation* case were substantially similar to those of *Creek Nation*. An erroneous 1872 survey resulted in the United States setting aside a reservation for the Pottawatomie tribe on land actually owned by the Seminoles in fee simple. In 1891, while the boundary mistake was yet unknown, the United States and the Pottawatomies agreed that some of the reservation land would be allotted to individual Pottawatomies in severalty and the remainder would be sold to white settlers. The sales to homesteaders were consummated between 1895 and 1913. Following the *Creek Nation* rationale, this court held that neither the erroneous survey nor the initial settlement of the Pottawatomies constituted a taking of the Seminole land, even though both acts deprived the Seminoles of the occupancy and use thereof. The court stated:

> * * * In the case at bar plaintiff does not sue for its loss of use and occupancy while the Pottawatomies occupied the lands as a reservation; it claims the fee and sues because it has been divested of this fee. It is entitled to recover as of the date of the divestiture. This occurred when the lands were disposed of pursuant to the agreement with the Pottawatomies under which the Seminole lands were conveyed to the United States. (102 Ct.Cl. at 620.)

Consequently, the court valued individual tracts of the former Seminole lands as of the times when such tracts had been allotted to individual Pottawatomies or patented to homesteaders.

We think that the principles applied in the *Seminole Nation* and *Creek Nation* cases have application to the instant problem, notwithstanding that the basis for recovery in this case is "unconscion-

able consideration" rather than a Fifth Amendment taking. The terms of Article XVI of the Treaty of July 19, 1866, support the proposition that neither the establishment of reservations on the Cherokee Outlet, nor the occupancy of these tracts by the resettled tribes, sufficed to deprive the Cherokees of their fee simple title, whereas conveyance of that title was a prerequisite of the termination of the interests of the Cherokee Nation. It follows that June 14, 1883, the date the Cherokees deeded the tracts to the United States for the use of the other tribes, is the most reasonable date for valuation of the reservation tracts.

The other cases relied on by appellant in support of earlier valuation dates are totally inapposite to the issue herein. In Kickapoo Tribe v. United States, *supra,* the United States claimed as an offset against an award in favor of the claimants the value of reservation lands gratuitously granted to the Kickapoos. The court determined that the reservation tract should be valued, for purposes of establishing the amount of the offset, as of the time the United States expended funds to acquire the tract for the intended purpose (*i. e.,* use as a reservation), rather than the subsequent dates when the tribe occupied the reservation or when formal title passed to the Kickapoos. In Northern Paiute Nation v. United States, *supra,* the Commission concluded that two reservation areas were "established" by the United States when the lands were set aside for that purpose in 1859, rather than in 1874 when the President, by Executive order, decreed the creation of the reservations. Neither case involved the termination of fee simple title to land held by an Indian tribe.

■ We decline to accept the Government's contention that the Cherokee Nation breached its treaty obligation by delaying the execution of the deeds until June 14, 1883. There was no evidence in the record before the Commission to support a conclusion that the execution of the deeds was unreasonably or unjustifiably delayed. We may agreed *arguen-*

*do* that the Cherokees could not have refused indefinitely to execute the deeds, for they were bound by the treaty to convey their title to the other tribes. However, it appears that the Cherokees objected to the consideration fixed by the President and delayed signing the requisite deeds pending satisfaction of that objection. That their objections were not viewed as unreasonable even during the period in question can be inferred from the fact that Congress approved increases in the amount of the consideration not only in the Act of March 3, 1883, but also in 1888, 1889, and 1893. In any event, execution of the deeds in 1883 does not appear unreasonable in view of the fact that the last reservation tract set aside under the terms of Article XVI, the Otoe and Missouria tract, was not confirmed by Congress until 1881. Kickapoo Tribe v. United States, *supra,* does not support appellant on this point. As noted, the court there found that the United States had expended funds to acquire the tract which was later given to the Kickapoos, in 1866. Noting that the measure of a credit accorded the United States for a gratuity given to a tribe is the amount of an expenditure by the United States, the court reasoned that the Government should not be given a profit on the amount of the credit due solely to the general rise in land prices between the time the land was acquired (as reservation land) and the time it was actually turned over to the tribe. The increase in the value of the land was unrelated to any additional expenditure by the United States. In the instant case we have determined that conveyance of title was, under the 1866 treaty, a necessary condition to the termination of Cherokee rights in the reservation tracts. The fact that the value of the land increased between the date of the treaty and the date the transactions were concluded is incidental to the resolution of the main issue before the court.

As previously noted, the Commission found that as of June 14, 1883, the several reservation tracts (2,121,928.74 acres) had a fair market value of $6,896,000, or $4,268,589 more than the consideration received by the Cherokee Nation during the nineteenth century. The Commission concluded that there was a gross disparity between the consideration paid to the Cherokees, and the then fair market value of the reservation districts, and held that the Cherokees were entitled to an award in the amount of $4,268,589, less allowable counterclaims and offsets. 22 Ind.Cl. Comm. at 425.

In a subsequent proceeding, the appellant presented to the Commission five distinct offset claims against the principal amount of the award. The Commission ruled in favor of the Government as to one of the claimed offsets, in the amount of $2,280, and disallowed the other four.[22] The United States here appeals from only one of these adverse decisions, claiming entitlement to an additional credit of $378,751.43 against the Commission's award in favor of the appellee. We are of the opinion that the United States is entitled to full credit for the claimed offset, as a matter of law, and that the decision of the Commission on this issue must be reversed.

The facts surrounding the claimed offset may be briefly set forth. The first reservation tract set aside on the Cherokee Outlet under the terms of Article XVI of the 1866 treaty was the Osage and Kaw reservation, confirmed in Congress by the Act of June 5, 1872.[23] The Act provided that the Cherokee Nation would be compensated for the land set aside for the Osage and Kaw tribal group out of the proceeds of the sale of former Osage land in Kansas. In the Act of March 3, 1873,[24] Congress direct-

---

22. 27 Ind.Cl.Comm. 23 (1972). *See* the Final Award of the Commission in Docket No. 173–A, *id.* at 33.

23. 17 Stat. 228.

24. 17 Stat. 530, 538. The relevant portion of the statute provides:
    *"Indian Bureau.*—That the Secretary of the Treasury is hereby authorized and directed to transfer from the proceeds of

ed the Secretary of the Treasury to transfer to the credit of the Cherokee Nation on the books of the Treasury the sum of $1,650,600 derived from the sale of the former Osage lands, or as much of said amount as was required to pay the Cherokees for the Osage reservation acreage. The Act further provided that the amount so transferred was to bear interest at the rate of five percent. The total acreage set aside for the Osage reservation came to 1,570,196.30 acres, and the President determined that the Cherokees should be paid $.70 per acre for that land. Consequently, on or about June 12, 1873,[25] the Secretary of the Treasury transferred the amount of $1,099,137.41 to the credit of the Cherokee Nation. It is undisputed that between June 12, 1873, and June 14, 1883, that amount, which was then considered to be the total consideration payable to the Cherokees with respect to the Osage and Kaw reservation district, earned a total of accumulated interest on the books of the Treasury of $378,751.43. It is this amount that the Government claims should be offset against the award in favor of the Cherokees.

The Commission concluded that the accumulated interest earned prior to June 14, 1883, was neither an additional payment to the Cherokees for the Osage tract nor a gratuity given without expectation of any reciprocal benefit or return from the Cherokees. It was not a gratuity, in the Commission's view, because the Act of March 3, 1873, providing for the payment of interest on the consideration for the Osage reservation, was a step in a tripartite agreement among the Cherokees, the Osages, and the United States.

It is our opinion, however, that the Commission's denial of the claimed interest offset is inconsistent with its determination, which we affirm, that the compensation to which the Cherokee Nation was entitled with respect to the reservation areas set aside for other tribes on the Cherokee Outlet is to be determined as of June 14, 1883. The Cherokee Nation's entitlement to such consideration also matured as of that date. It is not clear why Congress provided for the payment of interest with respect to the compensation for the Osage reservation in the Act of March 3, 1873. Such a provision is not related to any agreement contained in the Treaty of July 19, 1866, or to any other undertaking between the United States and the Cherokees of which we have notice. However, because the Cherokees were not entitled to the principal amount $1,099,-137.41, transferred to their credit on the books of the Treasury as of June 12, 1873, until June 14, 1883, it seems clear that the interest payments thereon were, *a fortiori*, entirely gratuitous.

It is well settled that, aside from certain exceptions not here relevant, the United States is entitled to set off against the amount of an award made pursuant to the authority of the Indian Claims Commission Act, the amounts of gratuitous expenditures made to or on behalf of the claimant. 25 U.S.C. § 70a; Peoria Tribe v. United States, 169 Ct.Cl. 1009, 1010 (1965); Sioux Tribe v. United States, 161 Ct.Cl. 413, 416, 315 F.2d 378, 380 (1963), cert. denied, 375 U.S. 825, 84 S.Ct. 66, 11 L.Ed.2d 57 (1963). The treaty with the Cherokees did not require it, nor was the Government otherwise obligated, either legally or

---

sale of the Osage Indian lands in Kansas, made in accordance with the twelfth section of the act of Congress approved July fifteenth, eighteen hundred and seventy, the sum of one million six hundred and fifty thousand six hundred dollars, or so much thereof as may be necessary, to pay for lands purchased by the Osages from the Cherokees, and to place the same on the books of his Department to the credit of the Cherokee Indians, the same shall bear interest at the rate of five per cent., in accordance with the act of Congress

approved June fifth, eighteen hundred and seventy-two, entitled 'An act to confirm to the Great and Little Osage Indians a reservation in the Indian Territory,' and the acts of Congress and treaties therein mentioned and referred to, whenever the amount to be so transferred shall be certified to the said Secretary of the Treasury by the Secretary of the Interior. * * * "

25. *See* Cherokee Nation v. United States, 102 Ct.Cl. 720, 743–744, 762 (1945).

morally, to pay interest on the purchase price of the land acquired for the Osages. Since the title did not pass until the Cherokees executed the deed on June 14, 1883, the Cherokees received interest to which they were not entitled.

For the foregoing reasons, we hold that the United States is entitled to a credit in the amount of $378,751.43 to be applied against the Final Award ($4,266,-309) of the Commission in favor of the Cherokee Nation on account of the cession of a portion of the Cherokee Outlet lands pursuant to the terms of the Treaty of July 19, 1866. The decision of the Commission disallowing the claimed offset in that amount (27 Ind.Cl.Comm. at 27, 33) is reversed.

The decision of the Indian Claims Commission establishing June 14, 1883, as the date for valuation of the subject tracts (22 Ind.Cl.Comm. at 437), is in all respects affirmed.

Affirmed in part.

Reversed in part.